[No. B078150. Second Dist., Div. Seven. Sept. 6, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
JUDE C. DeJESUS et al., Defendants and Appellants.

## Counsel

George L. Schraer, under appointment by the Court of Appeal, and Mark Alan Hart for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, John R. Gorey and Carl N. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

SCHIAVELLI, J.*—Appellants, defendants below, Jude C. DeJesus (DeJesus) and Ian S. Duncan (Duncan), appeal their convictions, after a jury trial, of one count of murder (Pen. Code, § 187 subd. (a)). With respect to the murder convictions of both appellants, the jury found true the special circumstances that the murder was intentional and carried out for financial gain (Pen. Code, § 190.2, subd. (a)(1)) and that the murder was committed while lying in wait. (Pen. Code, § 190.2, subd. (a)(15).) As to appellant Duncan, the jury also found true the special circumstance that the murder was committed during the commission of a felony, i.e., robbery. (Pen. Code, § 190.2, subd. (a)(17).) Also as to Duncan, the jury found true a principal armed allegation. (Pen. Code, § 12022, subd. (a)(1).) As to appellant

---

*Judge of the Los Angeles Superior Court sitting under assignment by the Chairperson of the Judicial Council

DeJesus, the jury found true an allegation he personally used a firearm in the commission of the murder. (Pen. Code, § 12022.5, subd. (a).)[1] Appellants were sentenced to life without the possibility of parole and were given no custody/conduct credits.

On appeal, both appellants contend the trial court denied them due process when it permitted the magistrate who heard the preliminary hearing to conduct the trial. They further argue the trial court erred in (1) failing sua sponte to instruct the jury on involuntary manslaughter, (2) failing to give a requested instruction that a prosecution witness was an accomplice, (3) failing to consider the holdings in *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697] and its progeny, (4) denying a defense request to play a taped statement of a prosecution witness to the jury, and (5) failing to credit appellants with section 693 presentence custody days.[2] In addition, Duncan contends the trial court erred in failing to authorize $500 to pay an expert to testify on his behalf. We reject all of appellants' claims save those relating to presentence credits, remand the matter to the trial court for calculation of the credits, and affirm the judgments in all other respects.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

### A. *The Prosecution's Case.*

Inasmuch as appellants do not argue a lack of substantial evidence to support the verdicts, the statement of facts will be relatively brief. Additional facts will be indicated in the ensuing discussion as necessary.

On February 19, 1992, Justin Zeitsoff (Zeitsoff) was shot to death at the Duncan home in the San Fernando Valley. Much of the prosecution evidence of what occurred at the time of the murder was introduced through the testimony of Corey Lohr (Lohr).[3] Lohr had known Duncan for a year and a half to two years and considered Duncan a friend. Duncan had periodically provided Lohr with a place to stay and was the principal source of the illicit drugs to which Lohr was addicted. In return, Lohr sometimes acted as a "bodyguard" for Duncan, who was an admitted dealer in illegal weapons. Lohr was also acquainted with DeJesus whom he had met approximately three times before Zeitsoff was killed.

For about a month before the killing, Lohr had been living with Duncan. About a week before the murder, they met at a McDonald's restaurant where

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

[2] Each appellant has joined in the arguments on appeal asserted by the other. (Cal. Rules of Court, rule 13.)

[3] As will be discussed in part II.C., *post*, Lohr testified under a grant of immunity for his involvement in the events on the night of the murder. The jury was apprised of that fact.

Duncan showed Lohr $500 and asked if he would kill someone. Duncan said the prospective victim was "some punk" who had "ripped him off." Duncan wanted him "taken care of." Lohr said he would think about it.

The next day, Duncan again showed Lohr the money. He repeated he knew Lohr needed the money and that it was worth $500 to kill someone. Duncan tried to convince Lohr to agree to the murder, but Lohr again indicated he would think about it.

A couple of days later, Duncan again brought up the subject. Lohr again asked who the intended victim was, and Duncan again said it was someone who had ripped him off. Duncan mentioned possible sites for the murder including the desert, a nearby deserted house, and a dark alley.

Three days before the murder, Duncan told Lohr the victim was to be Zeitsoff, who had cheated Duncan in a deal. Lohr had met Zeitsoff once a few weeks earlier at Duncan's house. Zeitsoff had purchased one or two guns from Duncan. At that time, Zeitsoff also showed Duncan and Lohr some stereo equipment he kept in the trunk of his BMW automobile.

Lohr had also seen a particular gun, a 9-mm. Calico, which belonged to Duncan. It was the gun which DeJesus would later use to kill Zeitsoff.

At the same time that Duncan identified the victim, he said also that after killing Zeitsoff, he expected to get a shotgun from Zeitsoff's trunk, at least $200 in cash, jewelry and the stereo equipment. Lohr did not take Duncan too seriously and suggested that, instead of killing Zeitsoff, Duncan should simply stop selling him guns. Duncan responded simply that Zeitsoff was a "punk."

Over the next couple of days there were more discussions about the proposed murder. Duncan wanted Lohr to either shoot Zeitsoff or slit his throat with a knife. Duncan mentioned committing the crime in his backyard or doing it in the desert. He suggested having Zeitsoff meet them in one of these places on the pretext of obtaining a gun. Duncan once again reminded Lohr that $500 was a large sum which Lohr needed.

Lohr continued to try to talk Duncan out of the murder. Lohr suggested that Duncan should just "rip off" Zeitsoff instead of killing him. Duncan continued to respond that Zeitsoff was a "punk" whom he wanted dead.

The day before the murder, Lohr said he could not kill Zeitsoff. Duncan responded that if he had to do it himself, Lohr would get only $250 for

helping get rid of the body. On the day of the murder, Lohr repeated he would not kill Zeitsoff. Duncan again urged him to do so and kept waving the money at him. When Lohr indicated he did not like guns, Duncan again suggested using a knife.

During that afternoon, DeJesus arrived at Duncan's house and asked if Duncan had any jobs DeJesus could do. Duncan smiled at Lohr and said he would ask DeJesus to kill Zeitsoff. Duncan and DeJesus went into the backyard for a few minutes, and when they returned, DeJesus told the person who had driven him to the house he would not be leaving.

At that point, Duncan described how the murder would be carried out. He said they would lure Zeitsoff to the house with the promise there were guns he could take with him and pay for later. When Zeitsoff arrived, Duncan would have him stand between the kitchen and living room and would then give DeJesus a signal to start shooting. Duncan told Lohr that DeJesus would be paid $500.

Subsequently, Duncan spoke to Zeitsoff on the telephone. After hanging up, Duncan said Zeitsoff would arrive between 9 to 9:30 p.m. to pick up the guns. Lohr said he did not want to be in the room when the murder occurred. Duncan wanted Lohr to be present, but Lohr said he would go into the bathroom.

The three then went out to obtain some heroin. However, because Duncan said that it was better they not be "high" during what was going to happen, they did not use it. Instead, they sat and watched television.

About 9:30 p.m. there was a knock at the door. Lohr went into the bathroom. About a minute later, he heard a gunshot. A few seconds later, he heard another gunshot. Then he heard approximately four more shots.

Duncan came to the bathroom door and told Lohr to go stuff a rag in Zeitsoff's mouth because he was moaning. Lohr found Zeitsoff slouched against a wall in the backyard. Lohr only came within 15 to 20 feet of Zeitsoff and then turned back, went into the house, and started crying. He had not seen a dead body before.

Duncan and DeJesus later told Lohr what had happened. In the kitchen, DeJesus shot Zeitsoff once, and he fell. Duncan and DeJesus thought he was dead. Zeitsoff then, as Duncan and DeJesus termed it, "did a Superman," i.e., rose to his feet and began running. He tried to climb the wall in the backyard, but Duncan pulled him off, and, when Zeitsoff fell to the ground, DeJesus shot him at least two more times.

After the murder, Duncan asked Lohr to go with him to Duncan's van to get some gloves. By this time, Duncan had already dragged the body a short distance in the yard. On the way to get the gloves, Duncan told Lohr to pull himself together, and that he (Duncan) could not move the body himself because his back hurt. DeJesus had refused to participate in moving the body.

On the way to the van, they encountered Duncan's neighbor who asked what the noise was about. Duncan said that a friend had picked up a gun which had "gone off" in his hands, but that everything was fine at that point.

After obtaining the gloves, Duncan and Lohr went back to the house, and Duncan began going through Zeitsoff's pockets. He took the jewelry and Zeitsoff's belt. Either Duncan or DeJesus took Zeitsoff's shoes. The next day, Duncan was wearing the belt. He asked Lohr if he liked it and said it was "really cool," and that "it came from a dead guy's body." Duncan also had the shoes the next day and said he would give them to a girl he liked. Lohr called Duncan a "sicko" and said she would not like them if she knew where they came from. Duncan responded that what she did not know would not hurt her.

Duncan and Lohr covered the body with plastic bags. DeJesus went to get Zeitsoff's BMW. Since the neighbor was still in his garage, DeJesus brought the car around to the back of the house to a market parking lot. The van was pulled in next to the car to provide cover from onlookers from the street.

Lohr jumped over the fence and went to the car. He and Duncan began emptying the BMW's trunk. They found clothes in the trunk, and DeJesus began sorting through them. Duncan took the BMW's stereo, a baseball bat, several baseball hats and a car stereo amplifier. He gave the stereo and one of the hats to his brother. DeJesus asked if he could keep the clothes. Duncan said yes, and DeJesus put the clothing he wanted in a large duffel bag.

After clearing the car, Duncan checked to see if his neighbor was still in the garage. Since he was, Duncan and Lohr tried without success to hoist the body over the backyard fence in order to take it to the car. Later, when the neighbor left, DeJesus brought the BMW to the front of the house. Duncan and Lohr brought the body around and put it in the trunk. Lohr then wiped the car where he thought he might have touched it.

DeJesus, wearing gloves, drove the BMW, with Duncan and Lohr accompanying him in the van. They dumped the car, and Duncan wiped it off to try to remove any fingerprints.

In the van, Duncan gave DeJesus a $100 bill and a .380-caliber gun. Duncan offered a $100 bill to Lohr. Suspecting the bill might be counterfeit, Lohr refused it. He later accepted $100 in $20 denominations. It was not clear whether the money was for Lohr's assistance in moving the body or to "keep him quiet."

As will be discussed in part II.C., *post*, portions of Lohr's testimony were confirmed by a witness named Robert E. Cooke, who had discussed the murder with both appellants. Cooke gave the information to his father, who notified police.

Police arrested DeJesus, and, the same day, executed a search warrant at the Duncan residence. There, police found the BMW's car stereo, the baseball bat, and one of the hats. Duncan, armed, was subsequently arrested.

## B. *The Defense Case.*

Again, since appellants do not argue a lack of substantial evidence, we will limit the discussion of the defense case to those points which are relevant to the issues on appeal. Further facts will be addressed in the discussion as necessary.

Duncan indicated that during the week of the killing, Zeitsoff had contacted him often because Duncan owed Zeitsoff some guns. On the day of his death, Zeitsoff told Duncan he would come by Duncan's house about 6 p.m. but later changed his mind and said he was not coming. Duncan and Lohr were using drugs and were under the influence by the evening.

DeJesus arrived at the house between 5:30 and 6 p.m. for lack of somewhere else to go. Duncan testified he never told DeJesus to kill Zeitsoff. Zeitsoff arrived unexpectedly between 7 and 9 p.m.

DeJesus and Zeitsoff went into the living room where several guns, including the loaded Calico 9-mm. were on a table. DeJesus picked up the Calico. Zeitsoff and Duncan briefly argued in the kitchen. At some point, Zeitsoff and DeJesus were each "playing" with a gun a few feet from each other. DeJesus had the Calico and Zeitsoff had a .380-caliber he had allegedly brought with him.

DeJesus testified that, at one point, Zeitsoff pointed his gun at DeJesus. At that moment, DeJesus, believing his life in danger, fired at Zeitsoff, hitting him. Although he testified he believed his life was in danger when he fired,

DeJesus also testified that the first shot happened to go off accidentally at the moment Zeistsoff pointed the gun.[4]

At that point, Zeitsoff chased Duncan into the backyard. After trying unsuccessfully to scale the wall, Zeitsoff pointed his gun at Duncan, and DeJesus fired several more times, killing Zeitsoff and saving Duncan's life.

After the shooting, DeJesus "freaked out" and was unable to help move the body. Duncan and Lohr moved it to the trunk of the BMW, and they took the car to the mansion. Lohr was never paid anything. While Zeitsoff's belongings were removed from the car, this was to make room for the body. The intent was to get rid of Zeitsoff's possessions, not steal them. Duncan wiped down the car because he was "scared." The homicide was not reported also because appellants were "scared."

## C. *Preliminary Hearing/Trial.*

The preliminary hearing was conducted before Municipal Court Judge Elden S. Fox. He bound both defendants over for felony arraignment.

Subsequently, when the case was called for trial, Superior Court Judge David Rothman assigned the case to Judge Fox, who was sitting by assignment in the superior court. Defense counsel objected to Judge Fox presiding over the trial. Defense counsel did not claim any actual bias on the part of the judge. To the contrary they expressed admiration for him. They simply argued it was a violation of their clients' due process rights to have the magistrate who presided over the preliminary hearing also assigned to the trial. All counsel agreed the judge had made no evidentiary rulings he would have to revisit at trial.

The defense had not exercised a challenge under Code of Civil Procedure section 170.6. However, counsel specifically stated that their objection to Judge Fox proceeding on the case was not to be construed as such a challenge.

Judge Rothman concluded that Judge Fox had not been called upon to make any rulings in connection with the preliminary hearing that would

---

[4]At oral argument, counsel for both sides indicated some confusion as to which shot or shots were claimed to be accidental. The record is clear that only the first shot was alleged to have been accidental. The rest were not. In any event, as will be evident, the question of which shots were intentional has no impact on our determination herein.

conflict with his responsibilities in presiding over the trial. Accordingly, the trial was assigned to Judge Fox.[5]

## II. DISCUSSION.

### A. *Preliminary Hearing Magistrate Acting as the Trial Judge.*

██ Appellants argue it was error for the trial court to permit the municipal court judge who acted as the magistrate at the preliminary hearing to preside at the felony trial.[6] Appellants do not suggest that as a result of his conduct of the preliminary hearing, the judge was actually biased in any way at trial. Nor do appellants contend there was anything in the judge's conduct of the preliminary hearing or trial which created an appearance of bias or other impropriety. To the contrary, at the outset of the trial, DeJesus's counsel, Mr. Keith stated the basis of the objection had nothing to do with Judge Fox, "I have nothing but admiration for Judge Fox. Strictly on legal grounds that [*sic*] he is barred from hearing this case." Thus, it is appellants' premise that it is impermissible as a matter of law for a judge to conduct both the preliminary hearing and trial regardless of any actual impropriety or the appearance of impropriety.[7] We disagree.

At trial, the trier of fact must determine whether the evidence is sufficient to prove the charges beyond a reasonable doubt. On the other hand, at the preliminary hearing, the magistrate is called upon only to determine whether the factual showing is sufficient to establish probable cause to believe the defendant committed a felony. (*People* v. *Uhlemann* (1973) 9 Cal.3d 662, 666-667 [108 Cal.Rptr. 657, 511 P.2d 609]; *Ruiz* v. *Superior Court* (1994) 26 Cal.App.4th 935, 939 [31 Cal.Rptr.2d 741]; section 866, subd. (b).) Clearly, these are fundamentally different factual determinations.

Thus, the magistrate's role is significantly different from that of the jury at trial. ██ " ' "An information will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it." ' " (*People* v. *Slaughter* (1984) 35 Cal.3d 629, 637 [200 Cal.Rptr. 448, 677 P.2d

---

[5]Judge Rothman also noted this is an issue which may recur in light of efforts at court coordination or unification.

[6]Appellants do not argue the trial judge was without jurisdiction to preside over the trial. Judge Fox had been assigned by order of the Chief Justice of California and Chairperson of the Judicial Council to sit as a superior court judge for all purposes. Such an order is a proper grant of authority. (*People* v. *Najera* (1979) 88 Cal.App.3d 930, 933-934 [152 Cal.Rptr. 124]; *People* v. *Santellanes* (1989) 216 Cal.App.3d 998, 1001, fn. 2 [265 Cal.Rptr. 281].) Thus, the trial judge's *power* to preside over the felony trial is not at issue here.

[7]As Judge Rothman noted below, this is an issue which will have increasing significance in light of efforts at court coordination and/or integration.

854], italics omitted; *People* v. *Superior Court* (*Quinteros*) (1993) 13 Cal.App.4th 12, 16 Cal.Rptr.2d 462].) The test is a limited one: whether there is such a state of facts as would lead a person of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused. (*People* v. *Uhlemann, supra,* 9 Cal.3d 662, 667.) If the test is met, the magistrate *must* hold the defendant to answer. (*People* v. *Orin* (1975) 13 Cal.3d 937, 947 [120 Cal.Rptr. 65, 533 P.2d 193].) Accordingly, evidence which will support a prosecution need not be sufficient to support a conviction. (*People* v. *McGlothen* (1987) 190 Cal.App.3d 1005, 1011 [235 Cal.Rptr. 745].) "In short, *the magistrate is not a trier of fact.*" (*People* v. *Slaughter, supra,* 35 Cal.3d at p. 637, italics added.)

It is only within this limited framework of responsibility that the magistrate weighs evidence, considers conflicts, and assesses credibility of witnesses. In order for the magistrate to fulfill this function, it is generally not necessary that he or she resolve all possible conflicts in the evidence and issues of credibility. (*People* v. *Slaughter, supra,* 35 Cal.3d at p. 637.) Indeed, to the contrary, as a practical matter, there will rarely be conflicts to resolve. Generally, the defense role at a preliminary hearing is relatively restrained. Normally, neither defense witnesses are called nor affirmative defenses actually litigated. For the most part, the defense limits itself to cross-examination of the prosecution witnesses. Moreover, as a result of the passage of Proposition 115, the preliminary hearing testimony is often limited to that of the investigating officer or other law enforcement person who, if qualified, may properly offer hearsay evidence to establish probable cause.

Consequently, assuming there is sufficient evidence of the elements of the charged offense and that the accused committed it, the magistrate will normally hold the accused to answer. This is not the same as saying that if the magistrate binds the accused over for trial, there has been a final determination the prosecution witnesses are telling the truth or that defense witnesses are not. The ultimate determination of the credibility of the witnesses will, of course, lie with the jury.

Since, in binding a defendant over for trial, there has been a finding only of probable cause, there is no inherent reason to expect that the judge who found that probable cause is then automatically convinced of the defendant's *guilt* or automatically so prejudiced against the defendant that he or she cannot, or will not, give the defendant a fair trial. Yet this is the essence of appellants' argument here. They concede there is nothing in the record to suggest Judge Fox's handling of the trial was impermissibly tainted by his exposure to the preliminary hearing; they assert only that it must have been,

i.e., that such a taint is somehow inherent in conducting the preliminary hearing.

To the contrary, we perceive no such automatic or inherent taint upon the magistrate who handles the preliminary hearing. It is common for trial judges to learn a good deal of information about the case and/or the defendant before and during trial. The trial court may acquire this information through pretrial proceedings, motions *in limine*, and motions during trial. It is not unusual for the trial judge to have reviewed a transcript of the preliminary hearing. None of this automatically bars the judge from presiding over the trial. ■ Indeed, even the fact that a judge presided over a prior trial does not, by itself, bar him or her from presiding over a retrial on remand after a successful appeal. (*People* v. *Aubrey* (1970) 11 Cal.App.3d 193, 196 [89 Cal.Rptr. 596].)

■ In *O'Neal* v. *Superior Court* (1986) 185 Cal.App.3d 1086 [230 Cal.Rptr. 257], cited by both sides, the magistrate conducting the preliminary hearing had previously reviewed the defendant's prior record in making a bail ruling at the arraignment. The defendant was held to answer and later attacked the information under section 995. (185 Cal.App.3d at p. 1088.) The defendant contended section 1204.5 precluded the magistrate from proceeding with the preliminary hearing.[8] The Court of Appeal concluded that, inasmuch as the judge had reviewed the defendant's prior record in conformity with an exception to section 1204.5, there was no requirement of disqualification from the subsequent trial. (185 Cal.App.3d at pp. 1091, 1093.) Thus, knowledge of the defendant's background, properly obtained, did not, by itself, compel disqualification of the judge.[9]

The protection against any actual prejudice arising out of the conduct by the trial judge of the preliminary hearing lies not in the blanket prohibition

---

[8]Section 1204.5 provided: "In any criminal action, after the filing of any complaint or other accusatory pleading and before a plea, finding, or verdict of guilty, no judge of any court shall read or consider any written report of any law enforcement officer or witness to any offense, or any information reflecting the arrest or conviction record of a defendant, or any affidavit or representation of any kind, verbal or written, except as provided in the rules of evidence applicable at the trial, or with the consent of the accused given in open court, or affidavits in connection with the issuance of a warrant or the hearing of any law and motion matter, or any application for an order fixing or changing bail, or a petition for a writ." The section was intended to preclude trial judges from routinely reading the police report and defendant's "rap" sheet. (*O'Neal* v. *Superior Court, supra,* 185 Cal.App.3d at p. 1091.) There was no evidence below that the trial judge had read such documents or that he had read the preplea report from the probation department. (See *Breedlove* v. *Municipal Court* (1994) 27 Cal.App.4th 60 [32 Cal.Rptr.2d 400].)

[9]Both sides also cite *People* v. *Santellanes, supra,* 216 Cal.App.3d 998. There, the magistrate presided over the preliminary hearing and bound the defendant over for trial. Immediately after conducting the preliminary hearing, the judge, sitting as a superior court judge, conducted a probation revocation hearing. The court used the facts adduced at the preliminary

proposed by appellants, but, rather, in the utilization of existing means of challenging a perceived bias or other lack of fairness of the trial judge. First, a judge who feels he or she is biased has an obligation not to preside over the proceedings. (Cal. Code Jud. Conduct, canons 3B(5), 3E.) Second, if counsel conclude a trial judge is for any reason biased, they may avail themselves of their remedies pursuant to Code of Civil Procedure section 170.1 or 170.6. (*People* v. *Aubrey*, *supra*, 11 Cal.App.3d at p. 196.) Here, neither appellant asserted any grounds under either section for the disqualification of Judge Fox. To the contrary, counsel for DeJesus specifically stated he was *not* asserting a section 170.6 challenge to Judge Fox.[10]

Thus, we conclude there is no inherent prejudice resulting from the fact a judge has presided over a preliminary hearing which would automatically disqualify that judge from presiding over the subsequent trial. If, in a particular case, an allegation of actual prejudice is made, that may be handled on its merits.[11] Inasmuch as appellants conceded, both at trial and on appeal, that there was no basis to disqualify Judge Fox other than the bare fact he had conducted the preliminary hearing, we find no error in the assignment of the case to him for trial.

### B. *Involuntary Manslaughter Instruction.*

Appellants contend the trial court erred in failing to give an instruction, sua sponte, on involuntary manslaughter. This contention is based upon the testimony of appellant DeJesus that he was not criminally responsible for any of the several shots he fired at Zeitsoff. As indicated, *ante*, DeJesus testified that all but his first shot at Zeitsoff were in self-defense and defense of Duncan. With respect to the first shot, it was DeJesus's testimony that he and Zeitsoff pointed their guns at each other and DeJesus's gun "accidentally" went off. DeJesus claimed he pulled the trigger, but did not mean to.

It is this allegation of an accidental shooting which appellants contend warranted the involuntary manslaughter instruction. They claim there was

---

hearing as the basis to revoke probation and impose a six-year state prison sentence. (*Id.* at pp. 1003-1004.)

The defendant had stipulated to transferring the probation hearing to the magistrate conducting the preliminary hearing, and he did not object to the procedure. However, in a footnote, the court noted that even absent the stipulation, the judge, who was on assignment to the superior court, was "empowered" to conduct the hearing. (216 Cal.App.3d at p. 1001, fn. 2.) This dicta in *Santellanes* appears merely to indicate that, pursuant to the assigment, the magistrate had *the authority* to conduct the probation revocation hearing. It is not clear that the issue of whether it was proper to have the same bench officer conduct both proceedings was squarely raised.

[10]Presumably, if counsel were concerned about any perceived actual bias, they would have exercised a Code of Civil Procedure section 170.6 challenge.

[11]For example, the preliminary hearing magistrate obviously could not hear a section 995 motion. (Code Civ. Proc., § 170.1, subd. (b).)

substantial evidence from which the jury could have concluded DeJesus had merely been negligent in accidentally firing the shot, and that the court should therefore have given the involuntary manslaughter instruction.

The issue raised by DeJesus is whether his somewhat improbable version of events was sufficient to compel the instruction (see *People* v. *Glenn* (1991) 229 Cal.App.3d 1461 [280 Cal.Rptr. 609]; *People* v. *Landrum* (1968) 261 Cal.App.2d 372 [67 Cal.Rptr. 911]) or whether his testimony was minimal and insubstantial. (See *People* v. *Hendricks* (1988) 44 Cal.3d 635 [244 Cal.Rptr. 181, 749 P.2d 836]; *People* v. *Dixon* (1995) 32 Cal.App.4th 1547 [38 Cal.Rptr.2d 859].) However, we need not reach the issue because, on the facts here, even assuming DeJesus's testimony constituted substantial evidence warranting the instruction, any alleged error in failing to give it was manifestly harmless. ██ "[A] defendant has a constitutional right to have the jury determine every material issue presented by the evidence. . . . an erroneous failure to instruct on a lesser included offense constitutes a denial of that right; and . . . such error cannot be cured by weighing the evidence and finding it not reasonably probable that a correctly instructed jury would have convicted the defendant of the lesser included offense." (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 720 [112 Cal.Rptr. 1, 518 P.2d 913] disapproved on another point in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1], citing *People* v. *Modesto* (1963) 59 Cal.2d 722, 729 (31 Cal.Rptr. 225, 382 P.2d 33).)

██ On the other hand, an error in failing to instruct on a lesser included offense will be deemed harmless where the record reflects the jury must necessarily have determined the factual question posed by the omitted instruction in the context of another, properly given instruction.[12] (*People* v. *Sedeno, supra*, 10 Cal.3d at p. 721.) In *Sedeno*, the Supreme Court concluded the failure to give an instruction that diminished capacity negated an intent to kill was necessarily harmless where the jury convicted the defendant of first degree murder rather than second degree. (*Ibid.*) Since the jury necessarily found intent, the verdict could have been no less than voluntary manslaughter under then existing law.

In *People* v. *Polley* (1983) 147 Cal.App.3d 1088 [195 Cal.Rptr. 496], the defendant, Polley, was convicted of first degree murder in the shooting death of his wife. On appeal, Polley contended the trial court erred in refusing to instruct on involuntary manslaughter. His claim was based upon his evidence (1) that he killed his wife accidentally while trying to commit suicide himself, and (2) that the killing occurred in the commission of a misdemeanor, i.e., exhibiting a firearm in a rude, angry or threatening manner (§ 417, subd. (a)(2)).

---

[12]There is no claim on this appeal that the instructions which were given by the trial court below were erroneous.

In affirming the judgment, the court concluded it was not required to decide whether either theory asserted by Polley was valid because the verdict of first degree murder showed the jury rejected the prerequisite to a verdict for involuntary manslaughter: the absence of malice. (147 Cal.App.3d at p. 1091.) Since the jury was instructed on second degree murder and voluntary manslaughter as well as first degree murder and was correctly instructed on malice, the verdict showed the jury concluded Polley acted with malice. Therefore, any failure to give the instruction was harmless. (*Id.* at p. 1092.)

Appellants contend this court has adopted a line of cases which are irreconcilable with *Polley* (and, presumably, *Sedeno*). Appellants' contention is based upon our opinions in *People* v. *Glenn, supra,* 229 Cal.App.3d 1461, and *People* v. *Webber* (1991) 228 Cal.App.3d 1146 [279 Cal.Rptr. 437]. In fact, neither of the holdings in those cases is inconsistent with the reasoning of *Polley* or *Sedeno*, as our opinion in *People* v. *Parnell* (1993) 16 Cal.App.4th 862 [20 Cal.Rptr.2d 302] reflects.

In *Glenn,* we confronted a situation in which the evidence was undisputed that the defendant, Glenn, had stabbed the victim, Thomas, to death. The two struggled, Glenn pulled a knife, Thomas backed away, and Glenn stabbed him. Glenn testified to two scenarios. First, he contended he was holding the knife because it was too big to place in his pants, and when Thomas approached him, Glenn, believing Thomas was going to grab him, turned "instinctively" and Thomas "got stuck" with the knife. Second, Glenn testified he was afraid Thomas was attacking him, so he stabbed Thomas without intending to kill him. (*People* v. *Glenn, supra,* 229 Cal.App.3d at p. 1464.)

The trial court instructed on first and second degree murder and voluntary manslaughter. The jury was also instructed that an honest but unreasonable belief in the need for self-defense negates malice and was, therefore, a defense to murder but not voluntary manslaughter.

The trial court refused an involuntary manslaughter instruction. Indeed, the court went farther, and, in a response to the jury's inquiry whether, if it concluded Glenn was not guilty of first/second degree murder or voluntary manslaughter, it could find involuntary manslaughter, the trial court instructed the jury that " '[i]nvoluntary manslaughter is not at issue in this case.' " (229 Cal.App.3d at p. 1468.) The jury convicted Glenn of voluntary manslaughter.

We held the failure to give the involuntary manslaughter instruction to be reversible error. In the portion of the opinion relevant here, we concluded

that the error was not harmless under *Sedeno* because only the second degree murder instruction presented the jury with the theory Glenn had no intent to kill, and the jury rejected second degree murder. (229 Cal.App.3d at p. 1468.) Thus, it could not be said the jury had resolved the issue, i.e., the intent with which Glenn stabbed Thomas, under other proper instructions as required by *Sedeno*. (*Ibid.*) Thus, we did not repudiate *Sedeno* or its progeny on the question of harmless error; we merely determined they did not apply.

In *Webber*, the defendant commandeered a car and driver and, while being driven throughout the city, fired several shots into another car, killing the victim. Webber was convicted of second degree murder. (*People* v. *Webber*, *supra*, 228 Cal.App.3d at p. 1160.)

At trial, the defense sought to prove Webber committed shooting out of an unreasonable belief, induced by drug intoxication leading to paranoid hallucinations, that he was about to be the victim of a drive-by shooting from the car into which he fired. The defense sought an involuntary manslaughter instruction, which the court refused. The jury was instructed on first and second degree murder, voluntary manslaughter, mental disease or defect, voluntary intoxication and unreasonable self defense. (228 Cal.App.3d at p. 1160.)

We noted that, as a result of section 22, subdivision (b), diminished capacity was no longer a complete defense. However, such evidence was relevant to show whether the defendant actually formed the requisite malice or intent to kill. (228 Cal.App.3d at p. 1162.) Accordingly, we concluded it was error to fail to give the requested instruction. The error was reversible because, based upon the instructions given, we concluded the jury could not have resolved the factual issues relevant to the diminished capacity/involuntary manslaughter issue, i.e., whether, due to the drug intoxication, the defendant actually harbored malice or the intent to kill.[13]

On the other hand, in *People* v. *Parnell, supra,* 16 Cal.App.4th 862, we concluded, relying upon *Sedeno*, that the failure to give an involuntary manslaughter instruction, though error, was harmless. In that case, the defendant was convicted of felony murder and attempted robbery after he shot a cashier in a restaurant during a holdup attempt. The defense alleged that the defendant was a victim of posttraumatic stress disorder resulting from his service in Vietnam. As a result, the defense argued, at the time of

---

[13]We reached a similar result in *People* v. *Ceja* (1994) 26 Cal.App.4th 78 [31 Cal.Rptr.2d 475]. There, the defendant offered evidence of imperfect self-defense, but the trial court refused to give instructions on voluntary or involuntary manslaughter. We concluded the error was reversible because, in convicting the defendant of second degree murder, the jury had not necessarily determined the factual issues raised by the defense.

the killing, the defendant was suffering hallucinations and believed the cashier to be a Viet Cong soldier. (*Id.* at pp. 866-867.)

The trial court rejected instructions on voluntary and involuntary manslaughter. On appeal, the defense contended this was error because even if the defendant formed the intent to commit the robbery, he could have suffered the hallucinations during the robbery, thereby undermining the murder charge. We concluded that, in light of the fact that the jury found the defendant guilty of attempted robbery and that the killing was committed during that attempt, the defendant was strictly liable for the killing. (16 Cal.App.4th at p. 874.)

The defendant also suggested several scenarios by which the jury could have rejected the attempted robbery charge and found him guilty of voluntary or involuntary manslaughter. We concluded however, that since the jury did find the defendant guilty of the attempted robbery and of killing the cashier during the robbery, all factual issues relating to the rejected manslaughter instruction had been resolved against the defendant. (16 Cal.App.4th at p. 874.)

Thus, in *Glenn*, we concluded that the verdict of voluntary manslaughter in the face of the jury's inquiry about involuntary manslaughter, did not *necessarily* resolve the factual issues relating to the question of intent; the jury might have concluded there was no intent. (See *People* v. *Dixon, supra*, 32 Cal.App.4th 1547, 1557, fn. 5.) In *Webber*, we concluded that the second degree murder conviction, did not *necessarily* reflect a resolution of the issue of the existence of intent raised by the diminished capacity defense, and finally, in *Ceja*, we concluded the second degree murder conviction again did not *necessarily* reflect a determination of the issue of the existence of malice raised by the allegation of imperfect self-defense.

On the other hand, the courts in *Sedeno* and *Polley*, and this court in *Parnell* have concluded that where the jury finds the defendant guilty of first degree murder, it necessarily reflects a determination of the defendant's intent. Thus, in *Sedeno*, the diminished capacity defense would not have permitted the jury to find involuntary manslaughter in the face of the finding of express malice, i.e., express intent, reflected in the first degree murder conviction. In *Polley*, the questions whether the killing was intentional, accidental, or the product of the negligent use of a firearm, were necessarily resolved against the defendant by the jury's first degree murder verdict. Finally, in *Parnell*, the jury's finding of felony murder foreclosed the issue of diminished capacity.

We believe the present case is governed by the reasoning in *Sedeno*, *Polley*, and *Parnell*. Here, the issue of accidental shooting raised by appellants goes to the intent with which DeJesus shot and killed Zeitsoff. We find

the jury's verdict resolved the factual issues raised by appellants against them for two reasons.

First, the jury here, unlike the juries in *Glenn*, *Webber*, and *Ceja*, convicted appellants of first degree murder. Thus, the jury found express malice, i.e., the intent to kill and found the murder was premeditated, deliberate and/or willful. Thus, having reached this factual conclusion, the jury could not have found defendants guilty of involuntary manslaughter. (*People* v. *Sedeno*, *supra*, 10 Cal.3d at p. 721.) Thus, as in *Polley*, the first degree murder conviction necessarily determined the issue raised by the defense of accident.

Second, the jury here, as in *Parnell*, found true the special circumstances alleged by the prosecution, i.e., that the murder was done after lying in wait, and that the murder was committed for financial gain. This, too, demonstrates the jury's factual determination the killing was intentional and deliberate.[14] Obviously, the jury could not have reached this verdict if it gave credence to the claim of an accidental shooting. At most, it would have found second degree murder without the special circumstances. Thus, here, the "omitted instruction was necessarily resolved adversely to [appellants] under other, properly given instructions."[15]

Therefore, we hold that to the extent the failure to give the involuntary manslaughter instruction was error, the error was harmless.

### C. *The Accomplice Instruction.*

Appellants contend the trial court erred in not giving their requested accomplice instruction in connection with Lohr's testimony. We agree. However, in light of the substantial corroboration of Lohr's testimony and the circumstances which would cause the jury to view his evidence with distrust, we find the error harmless.

Section 1111 provides the testimony of an accomplice, i.e., a person who may be charged with the same crime as the defendant, must be

---

[14]At oral argument, counsel for DeJesus argued that once the jury found the defendants guilty of first degree murder, the findings on the special circumstances were essentially automatic. To the contrary, the jury's verdict that the robbery special circumstance was not true as to DeJesus indicates the jury carefully considered the merits of each of the special circumstance allegations.

[15]In addition, Dr. Dibkin, the deputy medical examiner, testified Zeitsoff was killed by two shots to the chest, both of which were lethal. This evidence was uncontradicted. DeJesus testified that only one shot, his first, was fired accidentally. Clearly, then, the jury concluded that both shots were intentional and deliberate, rendering the involuntary manslaughter instruction irrelevant.

corroborated.[16] In order for the witness to be chargeable with the same crime as the defendant: ". . . it would be necessary for the witness to be considered a principal under the provisions of section 31, which includes '[a]ll persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or not being present, have advised and encouraged its commission. . . .' " (*People* v. *Hoover* (1974) 12 Cal.3d 875, 879 [117 Cal.Rptr. 672, 528 P.2d 760].)

To be an accomplice, a witness must have " ' "guilty knowledge and intent with regard to the commission of the crime. . . ." ' " (*People* v. *Daniels* (1991) 52 Cal.3d 815, 866-867 [277 Cal.Rptr. 122, 802 P.2d 906], citations omitted.) The definition of an accomplice "encompasses all principals to the crime including aiders and abettors and coconspirators." (*People* v. *Stankewitz* (1990) 51 Cal.3d 72, 90 [270 Cal.Rptr. 817, 793 P.2d 23].) To be an accomplice, one must act " 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging, or facilitating commission of, the offense.' " (*Id.* at pp. 90-91.)

The defendant has the burden of proving the witness's status as an accomplice by a preponderance of the evidence. (*People* v. *Fauber* (1992) 2 Cal.4th 792, 834 [9 Cal.Rptr.2d 24, 831 P.2d 249]; *People* v. *Sully* (1991) 53 Cal.3d 1195, 1228 [283 Cal.Rptr. 144, 812 P.2d 163].) Where the facts are in dispute, the issue is one for the jury. (*People* v. *Stankewitz, supra,* 51 Cal.3d at pp. 90-91; *People* v. *Sully, supra,* 53 Cal.3d at pp. 1227-1228; *People* v. *Tewksbury* (1976) 15 Cal.3d 953, 960 [127 Cal.Rptr. 135, 544 P.2d 1335]; *People* v. *Mayberry* (1975) 15 Cal.3d 143, 159 [125 Cal.Rptr. 745, 542 P.2d 1337].)

Here, appellants requested an accomplice instruction which the trial court refused on the basis appellants had not met their burden to prove Lohr was an accomplice by a preponderance of the evidence. While we do not believe Lohr was an accomplice as a matter of law, we do agree with appellants the issue was not free from doubt and should have been determined by the jury.

The principal question is whether Lohr had the requisite guilty knowledge and intent relating to the crime. Lohr indicated that, during the days preceding the murder, he had not taken Duncan seriously and had tried to talk him

---

[16]Section 1111 provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. [¶] An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

out of killing Zeitsoff. On the day of the murder, he told Duncan he would not be in the room, and, in fact, went into the bathroom when Zeitsoff arrived. To explain his failure to leave the premises completely and his involvement in moving the body after the murder, he indicated he was concerned that if he left the house or did not help in moving the body, he would be kicked out of Duncan's house and/or Duncan would no longer supply him with drugs.

On the other hand, Lohr testified he was aware of the plan. He knew DeJesus had been procured by Duncan to perpetrate the murder of Zeitsoff. When asked about his intended involvement in the plot, Lohr's response was, at best, enigmatic:

"Q. You had already told Ian, had you not, that you did not want to be involved in a—in a homicide; in a killing?

"A. I told him I would not kill [Zeitsoff].

"Q. Did you tell [Duncan] that although you would not pull the trigger, you would be willing to help out?

"A. Yes.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"Q. Do you have a recollection of telling [Duncan] in what manner you would be willing to help out?

"A. In helping get rid of the body."

With respect to his reason for wanting to be in the bathroom during the actual commission of the murder, Lohr testified he wanted to be there "[i]n case something went wrong." This suggests his reason was to protect himself, not to avoid participation in murder itself. At trial, he testified he was "not 100%" sure the murder would occur that night, but on prior occasions, he stated he knew it would occur. In any event, he never attempted to warn Zeitsoff of the plot to kill him.

After the murder, Lohr helped remove Zeitsoff's possessions from the BMW. He assisted in putting plastic covering over the body and in moving the body to the trunk of the BMW. He also assisted in wiping his and appellants' fingerprints off the car. He accepted $100 from Duncan, though it was not clear if this was for his help in removing the body or to "keep him quiet."

We conclude that, based upon all of the facts, the jury could have decided Lohr's testimony indicated he acted " 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging, or facilitating commission of, the offense.' " (*People* v. *Stankewitz, supra*, 51 Cal.3d at p. 90.) Accordingly, the issues of whether Lohr was an accomplice and the effect on his testimony if he was should have been submitted to the jury. (*People* v. *Sully, supra*, 53 Cal.3d at pp. 1227-1228; *People* v. *Mayberry, supra*, 15 Cal.3d at p. 159.)

However, the error was harmless here for two reasons. First, there was substantial evidence to corroborate Lohr's testimony in the record. ■ "It has been recognized that the failure to instruct on accomplice testimony pursuant to section 1111 is harmless where there is sufficient corroborating evidence in the record. . . ." (*People* v. *Miranda* (1987) 44 Cal.3d 57, 100 [241 Cal.Rptr. 594, 744 P.2d 1127], citations omitted.) The corroborating evidence may be entirely circumstantial. (*Ibid.*; *People* v. *Thurman* (1972) 28 Cal.App.3d 725, 730 [104 Cal.Rptr. 804].) The corroborating evidence may be " 'slight and entitled to little consideration when standing alone.' " (*People* v. *Miranda, supra*, 44 Cal.3d at p. 100; *People* v. *Tewksbury, supra*, 15 Cal.3d at p. 969.) Only a portion of the accomplice's testimony need be corroborated, and the corroborative evidence need not establish every element of the offense charged. (*People* v. *Sully, supra*, 53 Cal.3d at p. 1228.) All that is required is that the evidence " ' " 'connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the [accomplice] is telling the truth.' " ' " (*People* v. *Miranda, supra*, 44 Cal.3d at p. 100.)

■ At trial, Robert E. Cooke, a friend of both Duncan and DeJesus, testified at length to conversations with appellants which clearly corroborated Lohr's testimony.[17] Cooke testified that he had a conversation with Duncan two weeks prior to the murder of Zeitsoff during which Duncan said Zeitsoff had "fucked up a deal" and had to be "taken care of."

Then, four days after the murder, Cooke spoke with DeJesus. DeJesus admitted killing Zeitsoff with the 9-mm. Calico, which Cooke knew to be Duncan's. He said he killed Zeitsoff for a "dude" over a business deal Zeitsoff "messed up." DeJesus said they called Zeitsoff and told him to come to Duncan's house. When Zeitsoff arrived, DeJesus told him, "you fucked up," and shot him in the chest. DeJesus told Cooke that after being shot, Zeitsoff ran to the wall, and DeJesus shot him again after which jewelry and money were taken. DeJesus told Cooke that Lohr helped put the body in the

---

[17]Both appellants testified at trial, thereby eliminating issues concerning the use of their testimony.

car. Cooke testified DeJesus said he killed Zeitsoff for the money and the gun. He showed the gun to Cooke; it was Duncan's gun. DeJesus said he was to receive $500, but that he only received "a couple hundred."

The next day, Cooke again spoke to Duncan. Cooke indicated he was aware of the circumstances of Zeitsoff's death, and Duncan asked how he knew and inquired if DeJesus had told him. After telling Duncan that too many people already knew what happened, Cooke told Duncan he had made a mistake in having Lohr there because he would talk. Duncan responded, "Yeah. I know that. I fucked up right there." Laughing, Duncan went on to say he had given the Calico to another individual and that when that person was caught with the gun, he would "go down" for Zeitsoff's death.

Later, Cooke, Duncan and DeJesus met at a park. Duncan said he would give DeJesus money to go to New York. Cooke asked Duncan how he would do that when he had not paid DeJesus the full $500 Duncan had promised to pay. In response, Duncan just laughed and said, "[d]on't worry about it, he's taken care of."

This evidence clearly corroborated Lohr's version of what occurred in significant detail and was sufficient to reasonably satisfy the jury that Lohr was telling the truth. Thus, assuming Lohr was an accomplice, the corroborative evidence was more than adequate to render harmless the error in failing to give the accomplice instruction.

There is an additional basis to conclude the error was harmless: there was information apart from the accomplice instruction which rendered Lohr's testimony suspect. In *People* v. *Miranda, supra,* 44 Cal.3d at page 101, the Supreme Court noted that the purpose of section 1111 is to compel the jury to view accomplice testimony with distrust and suspicion. Therefore, any error in failing to give the instruction may be harmless if there are other circumstances which would cause the jury to mistrust the accomplice testimony and, upon the entire record, the court is not convinced it is reasonably probable a different outcome would have resulted absent the error. In *Miranda,* the accomplice testified he was given a reduced sentence with no additional jail time for his testimony and that he had previously lied about his involvement.

Here, Lohr testified he believed himself guilty of murder as an accomplice because of his involvement and that he was given immunity for his testimony. He also testified extensively to illicit drug use and to lies he had told the police and others concerning the murder. During the preliminary hearing, Lohr testified he had problems telling the truth if it would "affect his

situation." That preliminary hearing testimony was read to the jury at trial. Consequently, based upon the entire record, we are convinced the jury had an ample basis to view Lohr's testimony with distrust, and any error in failing to give the accomplice instruction was therefore harmless.

D. *Application of People v. Dillon.*

 Appellants contend for the first time on appeal that, at the probation and sentencing hearing, the trial court failed to consider application of the Supreme Court's opinion in *People* v. *Dillon, supra,* 34 Cal.3d 441 holding a court has discretion to reduce a conviction of first degree murder based upon the constitutional prohibition of cruel and unusual punishment.

First, *Dillon* makes clear that its holding was premised on the unique facts of that case. (34 Cal.3d at pp. 479, 482-483.) Since the determination of the applicability of *Dillon* in a particular case is fact specific, the issue must be raised in the trial court. Here, the matter was not raised below, and is therefore waived on appeal. (*People* v. *Ross* (1994) 28 Cal.App.4th 1151, 1157, fn. 8 [33 Cal.Rptr.2d 894].) Nevertheless, in order to "forestall a subsequent claim of ineffectiveness of counsel" (*People* v. *Martin* (1995) 32 Cal.App.4th 656, 661 [38 Cal.Rptr.2d 776]), we will consider the issue.

In *Dillon,* a 17-year-old boy with no prior record, had, with other boys his age, sought to steal marijuana from a nearby field. On their first try, the boys were discovered by the field's owner and were sent away at the point of a shotgun with threats they would be shot if they returned. Undaunted, the boys devised another plan. When they met for the second raid, several of them, including the defendant, were armed.

The boys spread out in the field. Upon seeing the brother of the owner, the boys halted their progress and hid for about two hours. During that period, two boys left, and two more were pursued by dogs but returned. The defendant and a few others watched from just outside the field.

One of the boys, apparently not visible to the group with the defendant, accidentally discharged his shotgun twice. The defendant believed these shots indicated that his friends were being shot and killed. He testified he "just wanted to get the hell out of there." He was very frightened. (34 Cal.3d at p. 482.) At about the same time the owner, who was carrying a shotgun, had circled around the defendant's group and was approaching. The defendant saw the owner and was sure the owner had seen him.

As the owner approached, he apparently shifted his shotgun so that it pointed in the defendant's direction. Terrified he was about to be shot

himself, the defendant lowered his .22-caliber rifle to his waist and began firing. He had no animosity toward the owner and did not think about how many times he fired. When the owner fell, the defendant stopped firing. The owner was hit nine times and killed.

Expert testimony at the trial demonstrated the defendant was very immature even for a boy his age. As a result, he had "blocked out" the reality of the situation and had fired reflexively.

Though the defendant was being tried for first degree felony murder, it was very clear that neither the jury nor the trial court felt a conviction for that crime was appropriate. The jury sent out a note inquiring about the expert testimony in light of the fact that the defendant was a minor being tried as an adult. The note indicated the jury's conclusion the defendant had the mental and emotional maturity of a minor. Later, the jury sent out a second note asking if it could find second degree murder or manslaughter even if it found felony murder. The trial judge replied in the negative, and the defendant was convicted of first degree murder.

The trial judge indicated his sympathy for the jurors' feelings and his view that on the evidence in the case, the felony-murder rule was particularly harsh. He felt the evidence did not support a first degree murder conviction. He told the jury the defendant could be sent to state prison or the Youth Authority and that he and the prosecutor welcomed their thoughts.

The jury foreperson then wrote to the court indicating the jury's reluctance to find guilt under the felony-murder rule, but that, though the penalty was extremely harsh given the defendant's mental and emotional state, it had no choice. The jury considered a lesser verdict, but felt its collective hands were tied. The jury implored the court to send the defendant to the Youth Authority.

With the concurrence of the intake supervisor of the Youth Authority, the court sentenced the defendant to that institution. The judge stressed his agreement with the position of the jury. On the defendant's subsequent appeal, the prosecution collaterally attacked the commitment. The Court of Appeal held the defendant ineligible as a matter of law for commitment to the Youth Authority. The court then determined it had no alternative but to sentence the defendant to life imprisonment in state prison.

The Supreme Court affirmed the judgment on the attempted robbery and modified the conviction of first degree murder to second degree murder. Though the felony-murder doctrine was statutory and could not be judicially

modified, the court concluded the penalty was, nevertheless, governed by constitutional limitations barring cruel and unusual punishment, and that punishment could be considered constitutionally infirm if it was inflicted by a cruel and unusual method or if it was "grossly disproportionate to the offense for which it was imposed." (34 Cal.3d at pp. 477-478.) The court went on to conclude that, on the facts of that case, the punishment was disproportionate.

■ Appellants' principal contention here is that the trial judge failed to perceive his authority to reduce the punishment in accord with the principles in *Dillon*. Appellants, relying upon *People v. Manriquez* (1991) 235 Cal.App.3d 1614 [1 Cal.Rptr.2d 600], seek to have the case remanded to the trial court so it may exercise its discretion. Finding no error, we decline to do so.

Appellants are asking this court to presume the trial judge was unaware of his power to reduce the sentence. There is nothing in the record to cause us to infer this to be the case. In *Dillon*, the record was very clear that the trial and appellate courts were of the opinion that, if the defendant was ineligible for Youth Authority commitment, there was no alternative but to punish the defendant under the statutory scheme.

Similarly, in *People v. Leigh* (1985) 168 Cal.App.3d 217 [214 Cal.Rptr. 61], cited by the parties here, the trial court erroneously concluded it had no discretion under *Dillon* to modify a first degree felony-murder conviction; the trial court believed that discretion was left solely to the appellate courts. (*Id.* at p. 223.) The Court of Appeal concluded the trial court did have that discretion and remanded the case to the trial court to exercise it. (*Id.* at pp. 223-224.)

Thus, in both cases, there was an affirmative showing in the record that the trial court failed to perceive its power to modify the sentence. Here, appellants argue that, since there is no evidence in the record to show the trial court exercised, or even recognized that discretion, the matter must be reversed. In making this contention, appellants misperceive their burden on appeal.

It is the appellant's duty to show affirmatively the trial court erred; there is no presumption to that effect. The trial court here merely stated it was imposing the penalty required by law. Appellants contend this shows a failure to consider the *Dillon* factors. However, neither *Dillon* nor its progeny suggests the trial court has a duty at every probation and sentencing hearing to put an analysis of the *Dillon* factors on the record.

In *People* v. *Hooton* (1959) 53 Cal.2d 85, 88 [346 P.2d 199], the defendant was convicted of first degree murder, but the first jury failed to reach a verdict on the penalty. The trial court impaneled a second jury, which imposed the death penalty. In deciding to impanel the second jury, the trial court stated, " '. . . the law states the Court shall dismiss the jury and order a new trial on the issue of penalty alone. . . .' " (*Id.* at p. 88.) On appeal, the defendant argued that the trial court mistakenly believed it had no alternative but to impanel a second jury and therefore failed to exercise its discretion to consider imposing life imprisonment. The Supreme Court concluded that while the trial court did not expressly state it was not going to sentence the defendant to life in prison, "it clearly had so determined when it ordered a new trial on the issue of penalty." (*Ibid.*) The court noted that at the time of the order, no claim was made by the defendant that the trial court had overlooked its power to impose imprisonment for life. The court went on to hold: "Moreover, *the presumption is that the trial court regularly performed its duty* and decided in the exercise of its discretion not to impose life imprisonment." (*Ibid.*, italics added.)

Similarly, in *People* v. *Moran* (1970) 1 Cal.3d 755 [83 Cal.Rptr. 411, 463 P.2d 763], the defendant contended the sentencing judge failed to consider a Youth Authority referral. The defendant had waived application for probation and did not request the referral, but the trial court nevertheless had a duty to consider referral. Since the record was silent, the Supreme Court held: "It is presumed that official duty has been regularly performed. (Evid. Code, § 664.) . . . Although no probation report was prepared, the trial court had sufficient information upon which to exercise its discretion. In the absence of any showing to the contrary, we must presume that it did so." (*Id.* at p. 762.)

The trial judge in the present case is an experienced bench officer and an experienced prosecutor. None of the parties indicated any doubt concerning his judicial competence. To the contrary, as already noted, defense counsel specifically indicated their respect for his ability. He had before him all of the information necessary to make an evaluation of the applicability of the *Dillon* criteria. His statement about imposing the term required by law is no more indicative of a failure to appreciate his discretion than the statement of the trial judge in *Hooton*. Accordingly, we conclude that, in imposing the life sentences in state prison, the trial court perceived no basis to exercise its discretion to reduce the punishment, a conclusion buttressed by the trial court's apt description of the crime as "heinous."

Appellants' reliance upon *People* v. *Manriquez*, *supra*, 235 Cal.App.3d 1614 is misplaced. In that case, the defendant pled guilty to second degree

murder and was sentenced to 15 years to life. At the probation and sentencing hearing, the trial court found her preemptively ineligible for probation based upon section 1203, subdivision (e)(1) relating to persons armed with a firearm. This conclusion was predicated upon an erroneous statement to that effect in the probation report. On appeal, the court concluded the section did not apply because it was not the defendant, but her accomplice, who had the gun. Therefore, since the trial court based its conclusion to deny probation "in significant part upon an erroneous impression of the defendant's *legal* status, fundamental fairness requires that the defendant be afforded a new hearing . . ." (235 Cal.App.3d at p. 1620, italics in original.)

Here, there was no confusion as to appellants' legal status. Moreover, unlike the present case, in *Manriquez*, as in the cases discussed, *ante*, the alleged error was apparent on the record.

Finally, even if we were to determine the trial court failed to exercise its discretion, we would decline to modify the sentence under *Dillon* or its progeny.[18] *Dillon*'s analysis is the exception, not the rule. (*People* v. *Munoz* (1984) 157 Cal.App.3d 999, 1014 [204 Cal.Rptr. 271].) In reviewing a particular case, we must look to determine if the penalty is grossly disproportionate to the offense as defined or committed and/or to the individual culpability of the defendant. (*People* v. *Dillon, supra*, 34 Cal.3d at p. 450; *People* v. *Munoz, supra*, 157 Cal.App.3d at p. 1014.)

Turning first to the nature of the offense, obviously appellants do not fare well. Appellants were convicted of an abominable crime: a deliberate, premeditated, carefully planned, cold-blooded murder accomplished by lying in wait and for financial gain. As to Duncan, the jury also concluded the murder was committed in the course of a robbery. The murder was planned and committed for the flimsiest of reasons: Zeitsoff had allegedly cheated Duncan out of some money in an illegal deal. DeJesus, who fired the fatal shots, had nothing against Zeitsoff but killed him solely for a small amount of cash and a gun. Thus, there is nothing in the nature of the offense to even suggest reduction of the sentence.

With respect to the culpability of the defendants, there is again nothing to warrant reduction of the sentence. The only factor to which appellants point is Duncan's age, 19. Duncan was not, unlike the defendant in *Dillon*, an immature, frightened minor, who acted out of terror. He was shown to be a gun and drug dealer who, with no apparent compunction, planned the murder and hired another to do it. He had previously been convicted of a firearms

---

[18]Appellate courts have the power to apply the *Dillon* analysis. (*People* v. *Leigh, supra*, 168 Cal.App.3d at pp. 223-224.)

violation. The probation report indicated, "The defendant has no apparent social conscience and will probably always present a very real threat to the lives of citizens in the community." DeJesus, age 25 when he murdered Zeitsoff, had been convicted of a weapons violation and shoplifting. The probation report stated, "The defendant is an extreme threat to society and his release back into the community would jeopardize the lives of others."

Based upon all of this, we conclude, "[t]he facts of the crime as committed in this case and the particular nature of the offender[s] who committed that crime . . . prevent us from taking a benign or sympathetic view of [appellants'] culpability. We therefore decline to reduce [their] convictions to second degree murder." (*People* v. *Munoz, supra,* 157 Cal.App.3d at p. 1015.)[19]

E. *The Physician's Testimony.*

Appellant Duncan contends the trial court erred in failing to allow him the $500 cost for the expert testimony of Dr. Terrance McGee. Appellant claimed Dr. McGee would have testified that, if Duncan had been using drugs on the night of the shooting as he claimed at trial, his mental state would have been lethargic and nonviolent. The trial court found the evidence irrelevant and, pursuant to Evidence Code section 352, too time consuming.

The issue of the relevance of evidence is left to the sound discretion of the trial court, and the exercise of that discretion will not be reversed absent a showing of abuse. (*People* v. *Green* (1980) 27 Cal.3d 1, 19 [164 Cal.Rptr. 1, 609 P.2d 468]; *People* v. *Von Villas* (1992) 10 Cal.App.4th 201, 249 [13 Cal.Rptr.2d 62]; *People* v. *Love* (1977) 75 Cal.App.3d 928, 933 [142 Cal.Rptr. 532].) That discretion is only abused where there is a clear showing the trial court exceeded the bounds of reason, all of the circumstances being considered. (*People* v. *Bradford* (1976) 17 Cal.3d 8, 20 [130 Cal.Rptr. 129, 549 P.2d 1225]; *People* v. *Giminez* (1975) 14 Cal.3d 68, 72 [120 Cal.Rptr. 577, 534 P.2d 65].)

Duncan argues that his state of mind at the time of the shooting was relevant. We agree. However, we also agree with the trial judge that, since Duncan was not the one who fired the shots, it is largely irrelevant whether he felt passive or not. Appellant makes no showing that, assuming he was lethargic or passive, he could not have harbored the intent to kill or

---

[19]Though not suggested by appellants, we also conclude, for obvious reasons, that there is no basis to modify the convictions predicated either upon a comparison of the penalty here with that for more serious crimes in this state or upon a comparison of the penalty here with that for the same offense in other jurisdictions. (See *In re Lynch* (1972) 8 Cal.3d 410, 425-427 [105 Cal.Rptr. 217, 503 P.2d 921].)

commit the robbery. Thus, the trial court did not abuse its discretion in concluding to exclude the evidence on the basis of relevance.

Moreover, the admission of the testimony presumably would have resulted in the prosecution's calling experts concerning the issue of an individual's and specifically, Duncan's, mental state after taking drugs. Thus, there would have been a great deal of time spent litigating an issue that was irrelevant. Thus, the trial court did not abuse its discretion in determining the consumption of time which would result from introduction of the testimony would have outweighed its, at best, marginal probative value.

F. *The Cooke Transcript.*

■■■ Appellants also contend the trial court's refusal to play the entirety of tape-recorded statements Cooke made to police constituted reversible error. Yet, appellants concede they had a complete transcript of the tape, and, as the trial court noted, the record reflects Cooke was cross-examined vigorously as to any inconsistencies. In essence, it seems appellants are making a best evidence argument. However, "[a] long line of cases in this state has held that neither recordings nor transcripts of recordings are subject to objection as not being the best evidence; it is reasoned that their great reliability warrants their use." (*People v. Fujita* (1974) 43 Cal.App.3d 454, 473 [117 Cal.Rptr. 757].)

Appellants contend the prosecution, in rebuttal argument, made statements concerning the tape that were incorrect. Any impropriety was cured both by the trial court's specific admonition to the jury that the prosecutor's statements were merely argument, and by the jury instruction that the statements of counsel were not evidence. The trial court did not abuse its discretion in refusing to permit the entire tape to be played to the jury.

G. *Presentence Credits.*

The trial court failed to award any presentence credits to appellants. This error was apparently brought to the attention of the court by virtue of a motion. Appellants have indicated the motion was granted, and the court stated an amended abstract of judgment would issue. There was apparently no opposition to the motion in the trial court, and the Attorney General concedes on appeal that appellants are entitled to presentence credits. Accordingly, the matter is remanded to the trial court with the orders to determine and award the credits, if any, to which appellants are entitled and to issue an amended abstract of judgment.

III. DISPOSITION.

The matter is remanded to the trial court to determine and award the appropriate presentence credits, if any, to appellants and to file amended

abstracts of judgment reflecting those credits. The judgments are affirmed in all other respects.

Lillie, P. J., and Johnson, J., concurred.

A petition for a rehearing was denied October 3, 1995, and appellants' petition for review by the Supreme Court was denied December 14, 1995.