Filed 8/11/17

**CERTIFIED FOR PUBLICATION**

APPELLATE DIVISION OF THE SUPERIOR COURT

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | |
|---|---|---|
| THE PEOPLE, | ) | BR 053153 |
| Plaintiff and Respondent, | ) | Long Beach Trial Court |
| v. | ) | No. 5LG03006 |
| STEVEN THOMAS FABER, | ) | |
| Defendant and Appellant. | ) | **OPINION** |

Appeal from a Judgment of the Superior Court of Los Angeles County, Long Beach Trial Court, Halim Dhanidina, Judge. Affirmed.

Miriam K. Billington for defendant and appellant Steven Thomas Faber.

Douglas P. Haubert, Long Beach City Prosecutor, Randall C. Fudge, Assistant Long Beach City Prosecutor, and Nadine E. Dahdah, Deputy Long Beach City Attorney, for plaintiff and respondent People of the State of California.

\* \* \*

## I.  INTRODUCTION

We determine here a court in sentencing a defendant on misdemeanor charges is not required to apply the aggravating and mitigating factors listed in the California Rules of Court for felonies, but may look to them for guidance.  We also find the trial court did not abuse its discretion or act unconstitutionally by imposing a six-and-one-half-year jail sentence based on 13 counts of intentionally and knowingly violating protective orders (Pen. Code, § 273.6, subd. (a)).

The evidence at trial showed defendant Steven Thomas Faber[1] violated the orders by repeatedly contacting a person he previously dated, primarily through text messaging, the Waze "smartphone" application, Instagram, and e-mails, and also by leaving letters and other items at her door and on her car.  The court in sentencing relied on defendant's threatening conduct and his criminal sophistication.  Defendant contends on appeal the court exceeded its sentencing discretion and that the sentence constituted cruel and unusual punishment.  As discussed below, we affirm.

## II.  BACKGROUND

A.    Facts

At trial, Kim K. (Kim)[2] testified she broke up with defendant at the beginning of May 2015,[3] after they dated for seven weeks.  Immediately after the breakup, Kim received multiple text messages from defendant despite her repeated requests that he cease contacting her.  Kim told defendant to stop contacting her because "his constant texting was making [her] feel threatened," but defendant continued to send her messages.

---

[1]On the notice of appeal, defendant's last name is spelled "Fabar."  But, because defense counsel and the People on appeal identify defendant's name as Faber—and defendant was sworn in to testify as Faber at the hearing when one of the restraining orders was issued—it appears the spelling in the notice of appeal is incorrect.

[2]We omit the full name of the victim to protect her privacy.  (See Cal. Rules of Court, rule 8.90.)

[3]All referenced dates are in 2015 unless otherwise indicated.

On May 26, Kim obtained a temporary restraining order, barring defendant from contacting her and harassing her, including through telephone, e-mail or other electronic means. Kim lived alone with her school-age son, and the order also required defendant to stay away from the apartment she shared with her son. The order was served on defendant at 8:33 a.m. on May 29, and a June 16 date was set for the court to consider issuing a longer-term order.

Within 30 minutes after defendant was served with the May 29 order, he sent Kim a text message, apparently attempting to minimize one of the reasons Kim decided to break up with him, by telling Kim, "The only reason my ex filed a restraining order was for financial reasons"; describing how his ex-wife's restraining order damaged his life; and ending with "Take care Kim. I loved you a lot." Despite the note of finality in the message, Kim received text messages from defendant later that same day, some originating from defendant's telephone and others from numbers she did not recognize.

Kim often got texts from telephone numbers that she did not associate with defendant, but each time she opened the message, it turned out to be from him.[4] The messages were similar, with defendant describing his relationship with his ex-wife, how she filed "false charges" against him, and blaming Kim for how bad he was feeling because Kim "dumped" him for "no logical reason." Kim texted defendant telling him he was in violation of the restraining order, but she continued to receive multiple text messages from him each day from May 30 through June 2. In the messages, defendant accused Kim of lying to his family about him calling her "a cunt"; he blamed Kim for defendant getting "kicked out of [his] place" because his landlord found out about the restraining order; defendant told Kim, when people became close to her, she "really hit [them] with a dagger"; and that she "pulled such a vicious sucker punch" in abruptly ending their relationship.

On June 1, at 1:56 a.m., Kim was at home when she received a message through the Waze smartphone application. Kim explained that, under the Waze application, a caller taps a button that says "I'm on my way," and the application automatically informs the recipient of

---

[4]Kim testified she blocked defendant's number, but she received text messages from defendant using approximately 10 different telephone numbers.

where the caller is located and what time they will arrive at their destination. The Waze message indicated to Kim that defendant was leaving his work and coming to her home. Kim testified this scared "the be-Jesus out of [her]," because Waze, which utilizes the navigation capabilities of the global positioning system (GPS), was indicating defendant was on his way to her home at an early morning hour. Defendant did not actually come to her home. Kim was afraid about what might have happened to her and her son if defendant had gone to the apartment because she knew that, prior to the termination of their relationship, defendant took a personality test that indicated he was a "sociopath."

On June 5, 6, and 7, defendant sent additional messages to Kim. On June 7 at 6:07 p.m., Kim texted defendant, imploring him not to contact her and telling him he was violating the protective order each time he communicated with her. At 7:28 a.m. the next day, defendant texted her again, including a text in which defendant asked Kim, "What did I do to deserve this kind of treatment from you? This is abuse if anything." Kim again texted him back telling him to stop texting her. Kim disconnected her personal telephone, and starting on June 14, defendant began sending text messages to her work cell phone.

On June 16, Kim went to court to request the longer restraining order. Defendant was present at the hearing, and he admitted to the court he sent her text messages while the temporary restraining order was in effect. The court issued a one-year restraining order which was similar to the temporary order, but that also specifically barred defendant from "reaching out" to Kim through social media. Defendant was served in court with a copy of the order.

On June 21, June 22, and again on June 26, defendant texted Kim multiple times on her work cell phone. On June 26, Kim told her supervisors what was happening with defendant's unceasing contacts, and her employer disconnected her phone.

On August 13, Kim came home at 1:00 a.m. after being out with her girlfriend, and found the following items at her front door: a bucket with sunflowers in it; a gold box containing a key chain; other items she had given to defendant when they dated; and sunflower seeds. There was also a written note from defendant, which Kim described as "the creepiest letter." The letter had been burned around its edges and was smeared with a red substance.

4

Defendant stated in the letter he applied "red dye" to the paper and he continued to express his dismay at the breakup. The letter also said, "[T]he sunflowers are such a good representation of you. They are both beautiful, last long and can be eaten. These sunflower seeds. Tasty. I mean that in a nice way, but they are just so bold and beautiful."

On September 7, Kim posted a photograph with a humorous image and a message on her Instagram account. Kim received a response from a person identified as "Universe Tom," an individual she did not know. From September 7 to 8, Kim and the person exchanged messages on Instagram discussing relationships and other personal matters, including Kim telling the person that, at age 51, she had learned to be happy being single. Finally, on September 8 she received a photograph on Instagram of her and defendant taken while they were dating, accompanied by a message informing Kim that defendant was Universe Tom. Kim blocked defendant from using the Universe Tom name to access her Instagram.

On either September 8 or 9, Kim opened the door to take her son to school, and found a small pumpkin at her front door and two letters from defendant on the windshield of her car. In one of the letters, defendant told Kim, "I really do not care that you blocked me from Instagram," and ended by saying, "I don't want to watch you get hurt. Please be smart." In addition, on September 13, 15, and 16, defendant sent e-mails to Kim, including one wherein defendant called her "sleazy" and "a cougar."

Rudy Romero, a detective assigned to the domestic violence detail, testified Kim called 911 over 10 times to report defendant's violations of the protective orders. Towards the end of his investigation in late September, Romero left several messages and e-mails for defendant to contact the police, but defendant did not respond.

B.   Sentencing

The prosecutor filed two sentencing memoranda, indicating the maximum sentence was 13 years, but requesting the court sentence defendant to two years in jail and grant probation for 36 months. The prosecutor recommended the court impose numerous probation conditions, including that defendant attend a domestic violence course and perform 100 hours of community service.

Defendant submitted a letter from his mother and father, who stated defendant had been a "wonderful son, husband, and father," but when he lost his job, "his entire personality changed . . . causing anguish to his entire family." The letter further indicated that, "because of defendant's erratic behavior," he was "in the midst of a painful divorce." The parents requested the court exercise leniency in sentencing defendant. Defendant also submitted the printout of an e-mail from one of the jurors in the case, wherein the juror suggested defendant should be required to undergo counseling.

At the sentencing hearing, Kim read to the court a lengthy note she wrote for the court's consideration. Kim detailed the tremendously negative effects defendant's crimes had on her life, including the great fear defendant instilled in her with his repeated unlawful contacts and "continued defiance of the law." Kim pointed out that, although in most of his e-mails and texts defendant professed his love for her, he also said things that caused her to fear him, like "you make me sick, you ruined my life."

Kim told the court she changed the locks on her doors and installed locks on her windows, had a 24-hour surveillance system mounted outside her apartment, created new e-mail accounts, and "spent numerous hours and hard-earned money crying out [her] distress in a therapist's office." Kim stated defendant violated the court's orders to stay away and not contact her "no less than 68 times," and related how she believed the only reason charges were not filed regarding the ex-wife's restraining order was because of an error in filling out the form. Kim further told the court defendant "systematically and ruthlessly abused [her] both emotionally and psychologically." She also stated she "cannot let go of the fear" defendant instilled in her, and she has "nightmares, images of what this man could do to [her] and [her] son." Kim asked the court to impose the maximum sentence of 13 years.

The prosecutor at the hearing told the court that defendant's rap sheet did not reflect any convictions. But, the prosecutor requested the court consider defendant's "contacts" with the police in 2014 for violating court orders.

Defense counsel asked the court to take into account that there was no violence, no great bodily injury, and no threat of harm involved in the case. Counsel also stated defendant's

conduct was not sophisticated, and defendant did not have any prior convictions. Defendant personally told the court at the hearing that he did not intend to cause Kim fear or harm, and he contacted Kim only because he was confused regarding why he and Kim broke up and why "she flipped out on [him]."

The court stated, "Presence or lack of any record or contact in any other jurisdiction is not really relevant to the court," and that it based its evaluation on "primarily the evidence that the court has heard in this trial." The court stated counseling was inappropriate because defendant had repeatedly shown he would not follow court orders even after having been personally informed by a bench officer to stay away from the victim and have no contact with her.

The court found defendant's repeated contacts with Kim amounted to a threat of harm. In particular, the court saw as threatening defendant coming to her home and leaving objects and notes. It also found defendant informing Kim through Waze he was on his way to her home at an early morning hour was a threat, observing, "[T]o say that is not threatening, I don't know what else is."

Even though defendant's position was he did not intend to scare or harm Kim, the court noted that he harmed Kim by repeatedly contacting her. The court also indicated the sentence should reflect "the seriousness of the crime and criminal sophistication which is quite evident in the defendant's attempts to circumvent the order by using unknown numbers to contact the victim, terrorizing her each time."

The court denied probation, and imposed a 180-day jail sentence on each count, ordering the sentences to run consecutively. The court also imposed a 10-year protective order on defendant, and ordered him to pay fines and fees.

### III. DISCUSSION

A.      Sentencing Discretion

*Legal standards*

"[T]he trial court's sentencing discretion must be exercised in a manner that is not arbitrary and capricious, that is consistent with the letter and spirit of the law, and that is based

7

upon an 'individualized consideration of the offense, the offender, and the public interest.' [Citation.]" (*People v. Sandoval* (2007) 41 Cal.4th 825, 847 (*Sandoval*).)

"'The burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' [Citation.] Concomitantly, '[a] decision will not be reversed merely because reasonable people might disagree. "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge." [Citations.]' [Citation.]" (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977-978 (*Alvarez*).)

Defendant argues the court erred in sentencing him, because it mistakenly found two factors in aggravation enumerated in California Rules of Court, rule 4.421,[5] and failed to consider factors in mitigation listed in rule 4.423. Specifically, defendant argues the court should not have relied on rule 4.421(a)(1)—as the crimes did not involve "great violence," "bodily harm," or "threat of great bodily harm"—and also should not have relied on rule 4.421(a)(8)—because the crimes were not carried out in a sophisticated manner. Defendant additionally maintains the court erred in not finding mitigating that defendant had no prior record under rule 4.423(b)(1), and in not finding the crimes involved great provocation that was unlikely to recur under rule 4.423(a)(3).

The rules upon which defendant relies apply only to felony cases. (Rule 4.403.) Rules 4.421 and 4.423 list aggravating and mitigating factors considered by a court in deciding whether to impose the low, middle or upper determinate prison term in a case where a defendant was convicted of a felony. (Rule 4.420.)

A trial court in a misdemeanor case may properly look for guidance to what the rules consider to be aggravating and mitigating. But, in reviewing the propriety of a misdemeanor sentence, an appellate tribunal assesses whether the sentencing court's decision was arbitrary or capricious, not whether a particular fact considered by the court was aligned with a felony

---

[5]All further references to rules are to the California Rules of Court.

sentencing factor spelled out in the rules.  (See *People v. Carmony* (2004) 33 Cal.4th 367, 376-377 [sentencing decision will not be reversed unless it is "so irrational or arbitrary that no reasonable person could agree with it"]; see also *People v. Tenorio* (1970) 3 Cal.3d 89, 95 ["When an individual judge exercises sentencing discretion, he [or she] exercises a judicial power which must be based upon an examination of the circumstances of the particular case before him [or her], and which is subject to review for abuse"].)  Here, notwithstanding the felony sentencing factors in the rules, the circumstances considered by the trial court were supported by the record and rationally justified the term imposed.

*Threat of great bodily harm as aggravation*

Even before the temporary restraining order was issued, defendant knew he was threatening Kim—indeed, Kim told defendant "his constant texting was making [her] feel threatened"[6]—yet repeated texts and other contacts ensued after the temporary and one-year orders were issued.  Continuing to repeatedly contact Kim under these circumstances was reasonably interpreted by Kim as a threat.  Defendant in his texts accused Kim of ruining his life, poisoning his relationship with his parents, and risking him being evicted.  Kim could rationally believe defendant—who believed he was grievously harmed by Kim—had a powerful motive to retaliate against her by inflicting great bodily harm.  Also, the fact defendant acted fully undeterred by direct commands from a court to cease contacts communicated to Kim that his lawless behavior could include defiance of laws protecting her from harm.

Although defendant did not overtly state he was going to physically injure Kim, he used words and terms in his texts and letters which were loaded with violent metaphors, including telling Kim she "really hit [those who were close to her] with a *dagger*," and that she "pulled such a *vicious sucker punch*" in breaking up with him.  Telling Kim she hurt him and using

---

[6]In addition, the transcript of the June 16 hearing wherein the one-year restraining order was issued was admitted into evidence.  The transcript indicates the court at the hearing quoted that, in a May 25 text, Kim told defendant the "barrage of texts are [*sic*] causing me severe anxiety and to feel unsafe."

phrases infused with violence communicated to Kim that, as she continued to reject his contacts, he might retaliate by using *actual* violence on her.

One of the notes defendant left when he passed by Kim's home was described by Kim as "the creepiest letter." The letter said the sunflowers he left at her door were a good representation of Kim because they were "both beautiful, last long and *can be eaten*." Although defendant said he meant this in "a nice way," given Kim's knowledge that defendant was a self-described "sociopath," Kim could have perceived the reference as having Jeffrey Dahmer-like connotations or, at a minimum, he fantasized about sexually assaulting her. Moreover, it would have taken little imagination for Kim to identify the red substance smeared on the letter as resembling blood, and the use of fire to decorate the edges of the letter was also ominous. The letter defendant left on her car windshield said, "I don't want to watch you get *hurt*. Please be smart." Given defendant's unceasing communications and the pain and misery he blamed Kim for inflicting on him, the letter could reasonably have been construed by the court as an implied threat to hurt Kim.

The court also pointed out defendant's contact using the Waze application was threatening. As described during trial, the Waze message was triggered by a command on defendant's phone. The 1:56 a.m. message stated it was from defendant and said "I'm on my way," indicating defendant was going to Kim's home. Kim knew Waze was linked to the GPS navigation system, giving the message an aura of accuracy by automatically confirming with the push of a button that defendant was heading in her direction. Kim was terrified at the prospect of defendant coming to her home at such an hour. Kim told the court at sentencing she had nightmares and continued to fear what defendant could do to her and her son. Defendant deliberately informing Kim through Waze that he was coming to her home at 1:56 in the morning, under the circumstances, could have been taken as a threat that he was coming to do her and/or her son harm. The Waze-mediated contact was soundly assessed as an aggravating threat by the court.

10

*Criminal sophistication as aggravation*

Using 10 different telephone numbers to carry out the crimes was sophisticated, because it required knowledge of how text messages are received and read, and the wherewithal to generate and employ multiple phone numbers. Kim described how she would receive a text with a number she did not associate with defendant, but, to determine who sent the text, she would have to open and read the message. Defendant's use of different numbers thus increased the likelihood Kim would read his messages. Employing different numbers was also sophisticated in that it allowed defendant to keep contacting Kim even after the phone number he previously used was blocked. Defendant's hydra-like series of texts continued even after Kim disconnected her personal telephone and defendant started contacting her through her work phone.

We presume the court also considered as sophisticated defendant's series of contacts on Instagram. (See *Alvarez*, *supra*, 14 Cal.4th at p. 977 [in reviewing a sentence, the "trial court is presumed to have acted to achieve legitimate sentencing objectives"]; accord, *People v. Superior Court (Du)* (1992) 5 Cal.App.4th 822, 835-836 (*Du*) [it is presumed the trial court has considered all relevant criteria unless the record affirmatively demonstrates otherwise].) Defendant's use of the online name Universe Tom to communicate with Kim exhibited sophistication. Over a two-day period, defendant "catfished"[7] Kim. He deceived her into disclosing intimate details concerning her feelings about personal relationships, and afterwards cruelly disclosed she had been unwittingly communicating with the person that had been tormenting her for months. Electronic trickery and manipulation indicate a measure of sophistication which the court could reasonably have found aggravating.

*Lack of criminal record as mitigation*

Defendant points to a statement made by the court during sentencing as indicating it did not consider defendant's lack of criminal record whatsoever. The court stated, "Presence or lack of any record or contact in any other jurisdiction is not really relevant to the court." Yet,

---

[7]See < https://en.oxforddictionaries.com/definition/catfish > [as of Aug. 7, 2017] [to "[l]ure (someone) into a relationship by adopting a fictional online persona"].)

this statement was qualified by the court indicating these matters were not "really" relevant—meaning they had only *slight* importance in the court's view. It was also qualified by the court immediately thereafter, noting it was basing its evaluation on "*primarily* the evidence that the court has heard in this trial"—meaning it *did* consider the factors immediately preceding the qualification.

Further, the court's statement has to be considered in the setting in which it was made. Defendant argued at sentencing that his lack of prior convictions was mitigating. But, the prosecutor pointed out that, although defendant's rap sheet showed he had no convictions, it did reveal "contacts" defendant had with the police for violating orders issued by courts in Pasadena and Arcadia. Kim testified defendant had previously been under a protective order concerning his ex-wife and that he had violated that order.[8]

To the extent these "contacts" related to prior violations of the order pertaining to defendant's ex-wife, the court could have considered the conduct in aggravation. (See *People v. Santana* (1982) 134 Cal.App.3d 773, 784 [outlining ways properly substantiated arrests may be used in aggravation].) When the court stated, "*Presence* or lack of any record or *contact in any other jurisdiction* is not really relevant," the court was indicating it exercised its discretion in ascribing minimal importance to *both* aggravation and mitigation given other factors considered, rather than the court having chosen to wholly ignore the mitigation presented. Given the other attendant circumstances of the crimes and defendant's culpability, the court acted within its discretion in making this determination.

*Unusual circumstances as mitigation*

The court did not address whether the crime was likely to recur. We presume the court rejected this factor as being mitigating, because it viewed as *aggravating* that the crimes were

---

[8]Kim also testified she found and read a copy of the restraining order covering the ex-wife, and that when she told defendant's mother defendant would not stop contacting her, the mother told Kim defendant had "done this before" to his ex-wife.

likely to *recur*. The court's determination was supported by the record, as the court was aware defendant repeatedly contacted Kim and showed no inclination he was going to stop.[9]

Defendant also argues that, due to the unusual circumstances that led to his criminal behavior, the court should have ordered defendant to participate in counseling rather than deny probation and sentence him to jail. The argument lacks merit, because the court stressed it *would* have considered ordering some form of therapy for defendant if the court believed it useful. The court reasonably rejected therapy as an option because it found defendant would not follow court orders. The court was aware defendant had been subject to a protective order regarding his ex-wife, and it had the discretion to find Kim's statements that defendant violated that order to be credible.[10]

*Summary*

The court engaged in "an 'individualized consideration of the offense, the offender, and the public interest.' [Citation.]" (*Sandoval*, *supra*, 41 Cal.4th at p. 847.) The question before us is not what sentence would have been meted out by the appellate court. (*Alvarez*, *supra*, 14 Cal.4th at p. 978.) Our review indicates the court considered all the pertinent circumstances, and did not abuse its discretion in so doing.

B.      Cruel and Unusual Punishment

*Legal standards*

Defendant argues the sentence should be reversed because requiring him to serve six and one-half years in jail for his crimes constituted unconstitutional cruel and unusual punishment. Defendant forfeited this argument on appeal by failing to raise the issue in the trial court. (See

---

[9]Defendant argues the court's determination that defendant would not obey orders was contradicted by "the fact that as soon as law enforcement contacted [defendant], the unlawful contacts completely ceased." However, although no evidence was presented of any contacts after September 16, which was around the time Romero left messages for defendant to contact the police, Kim testified defendant *did* contact her after that date. It was within the purview of the trial court to believe Kim on this point.

[10]Defendant maintains the court abused its discretion in sentencing him because the prosecutor recommended 36 months of probation and two years in jail. We reject the argument because "a trial court's discretion in imposing sentence is in no way limited by the terms of any . . . sentences offered the defendant by the prosecution." (*In re Lewallen* (1979) 23 Cal.3d 274, 281.)

*People v. DeJesus* (1995) 38 Cal.App.4th 1, 27.)  However, as the facts upon which defendant relies were developed at sentencing, and to forestall a claim that the trial attorney rendered ineffective assistance of counsel by not arguing the issue, we exercise our discretion to consider the argument.  (See *In re Sheena K.* (2007) 40 Cal.4th 875, 887, fn. 7; *In re Victor L.* (2010) 182 Cal.App.4th 902, 928.)

Cruel and unusual punishment is prohibited by the Eighth Amendment to the United States Constitution.[11]  With respect to a sentence for a term of years, "'the Eighth Amendment contains a "narrow proportionality principle," that "does not require strict proportionality between crime and sentence" but rather "forbids only extreme sentences that are 'grossly disproportionate' to the crime."'  [Citation.]"  (*In re Coley* (2012) 55 Cal.4th 524, 542 (*Coley*); see *Graham v. Florida* (2010) 560 U.S. 48, 59-60; *People v. Carmony* (2005) 127 Cal.App.4th 1066, 1076.)

In assessing a claim of cruel and unusual punishment, "'[a] court must begin by comparing the gravity of the offense and severity of the sentence.  [Citation.]  "[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality" the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions.  [Citation.]  If this comparative analysis "validate[s] an initial judgment that [the] sentence is grossly disproportionate," the sentence is cruel and unusual.  [Citation.]'  [Citation.]"  (*Coley*, *supra*, 55 Cal.4th at p. 542.)  Successful challenges based on gross disproportionality are "'exceedingly rare'" and are found only in an "'extreme'" case.  (*Lockyer v. Andrade* (2003) 538 U.S. 63, 73.)

*Application in present case*

With respect to the gravity of the offense, under the current circumstances, a violation of Penal Code section 273.6, subdivision (a), is proved when a person commits "[a]ny intentional

---

[11]Defendant's appellate counsel enumerated in her briefs that only the Eighth Amendment was violated.  Hence we do not consider whether the sentence violated the California Constitution's bar to "cruel or unusual punishment."  (Cal. Const., art. I, § 17.)

and knowing violation" of a civil harassment order issued under Code of Civil Procedure section 527.6. Such orders include both temporary restraining orders and orders issued after a court hearing. (Pen. Code, § 273.6, subds. (c), (i).) The orders can be issued only upon a finding of "harassment," including that a person engaged in "a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose" and "which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." (Code Civ. Proc., § 527.6, subd. (b)(3).)

Penal Code section 273.6, subdivision (a), can be violated by a defendant on a single occasion of contacting a person protected by an order issued under Code of Civil Procedure section 527.6. But, the present case involves multiple violations, and rather than considering the nature of the offense for which the sentence was imposed in the abstract, we "take into consideration all of the relevant specific circumstances under which the offense actually was committed." (*Coley*, *supra*, 55 Cal.4th at p. 553.)

The jury found defendant guilty of 13 separate violations of the statute, but Kim indicated there were many more violations. Further, several violations occurred after a protective order was issued following a hearing attended by defendant, and after Kim specifically and repeatedly told defendant he was in violation of the court order by contacting her. Defendant disobeyed the orders twice by going in person to the apartment Kim shared with her son, leaving items and notes which were reasonably perceived as threatening. The vast majority of the violations occurred through defendant's use of an array of electronic methods. Using text messages, e-mails, Waze and Instagram, defendant threatened the victim's security, rendering her life a technological nightmare. His relentless approach featured the use of numerous phone numbers and required Kim to disconnect telephone numbers. Defendant's contacts distressed Kim to the point that she sought the help of a therapist, and placed her in such fear that she called 911 over 10 times and installed home surveillance equipment and new locks.

15

Defendant argues that his motive in repeatedly violating the court orders, as explained by his parents' letter to the court, was to contact Kim due to his "suffering a life crisis" because of his divorce, and his breakup with Kim was "emotionally painful." But, according to the parents' letter, defendant's loss of his job was the reason "his entire personality changed" causing "anguish to his entire family" and "erratic behavior" that led him to "a painful divorce." Defendant himself, in his statements to the court, though indicating he did not intend to harm Kim, appeared partly to blame her for his repeated contacts and stated he acted because he was confused regarding why Kim "flipped out on [him]."

Defendant correctly notes the record showed he had no prior criminal convictions and was "a middle-aged father, recently unemployed, going through a tumultuous divorce and an emotionally painful breakup." However, there was also evidence before the trial court that defendant, although apparently not previously arrested or criminally charged, had violated a restraining order protecting his ex-wife, demonstrating a pattern of being unwilling or unable to obey court orders. The trial court reasonably found no amount of counseling could remedy defendant's imperviousness to being able to follow rules, and this personality trait greatly diminished any mitigation found in defendant's personal characteristics.

Regarding the severity of the sentence, a single violation of Penal Code section 273.6, subdivision (a), is punishable as a misdemeanor by a fine not exceeding $1,000, or by imprisonment in a county jail for not more than one year, or by both the fine and imprisonment. The court ordered no fine under the statute, and imposed 180 days in jail consecutively on each of the offenses. The resulting six-and-one-half-year sentence was thus one-half the maximum sentence of 13 years in jail, and with good-time, work-time credits under Penal Code section 4019, defendant may serve no more than 50 percent of the sentence, or less than three years and three months in jail.[12]

---

[12]Because a "year" is defined for sentencing purposes as 364 days (Pen. Code, § 18.5, subd. (a)), and defendant was convicted of 13 counts, the maximum possible sentence was 13 days less than 13 actual years. Also, strictly speaking, 13 consecutive 180-day sentences amounted to about two months less than six and one-half years.

The repeated offenses, the callousness exhibited in how they were committed, and the length of time defendant will serve do not allow us to find this is "the rare case" in which comparison of the gravity of the offense and severity of the sentence "'leads to an inference of gross disproportionality.'" (*Coley*, *supra*, 55 Cal.4th at p. 542.) Given this determination, we have no reason to "'compare . . . defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions.' [Citation.]" (*Ibid.*)

We note, though, defendant's argument that the sentence was unconstitutional because he could have received lesser punishment if he had been convicted of felony stalking lacks merit. Defendant's conduct may well have qualified as stalking, as the elements of this crime include "engag[ing] in a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose," and stalking when there is a protective order is punishable with up to four years in state prison. (See Pen. Code, § 646.9, subds. (b), (e).) Yet, although four years is less than the six and one-half years defendant received, the length of the two sentences are comparable, if not equivalent, and the Eighth Amendment "'does not require strict proportionality between crime and sentence.'" (*Coley*, *supra*, 55 Cal.4th at p. 542.)

Further, defendant fails to appreciate that equating a prison sentence to jail is like comparing apples and oranges. For example, a person sentenced to prison, unlike one confined in jail, is forever barred from seeking expungement under Penal Code section 1203.4 (see *People v. Borja* (1980) 110 Cal.App.3d 378, 381),[13] and a jail inmate will have no further obligations upon completion of the sentence, while a person released from prison will still be supervised on parole (Pen. Code, § 3000 et seq.). (See *In re Valenti* (1986) 178 Cal.App.3d 470, 475 [finding "a significant difference in the quality and duration of punishment, as well as in resultant long-term effects, which are brought about by a conviction for a felony as opposed

---

[13]Because he was not granted probation, defendant was ineligible for expungement under Penal Code section 1203.4. But, he may request expungement under Penal Code section 1203.4a once he finishes serving his sentence.

to that for a misdemeanor," and noting "[a] felon is uniquely burdened by a diverse collection of statutorily imposed disabilities long after his release from prison"].)

*IV.*  DISPOSITION

The judgment is affirmed.

 

 

_____
RICCIARDULLI, J.

We concur:

 

 

_____           _____
KUMAR, Acting P. J.                   RICHARDSON, J.