Filed 1/20/22  P. v. Gonzalez CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ARTURO ALDO GONZALEZ,<br><br>    Defendant and Appellant. | F079472<br><br>(Super. Ct. No. BF167379A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Charles R. Brehmer, Judge.

Richard M. Doctoroff, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Barton E. Bowers, Lewis A. Martinez, and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Arturo Aldo Gonzalez was convicted by a jury of carjacking, armed robbery, making a criminal threat, and evading a peace officer, and sentenced to an

aggregate term of 23 years, eight months.  He raises three issues on appeal.  First, he contends he is entitled to a remand to afford him an opportunity to request pretrial mental health diversion under Penal Code section 1001.36.[1]  Second, he argues his sentence constitutes cruel and unusual punishment under the federal and state constitutions.  Third, he requests a remand for the trial court to consider his ability to pay the fines, fees, and assessments imposed as part of his sentence.

We conclude that all three of these issues were forfeited for failure to raise them below and conclude Gonzalez has not demonstrated his trial counsel provided ineffective assistance in connection with any of the claims.  We therefore affirm.

## STATEMENT OF THE CASE

Gonzalez committed the offenses in this case on February 23, 2017, when he was 34 years old.  On April 21, 2017, the Kern County District Attorney filed an information charging Gonzalez with carjacking (§ 215, subd. (a); count 1), making a criminal threat (§ 422; count 2), robbery (§ 212.5; count 3), and misdemeanor evading a pursuing peace officer's motor vehicle (Veh. Code, § 2800.1, subd. (a)).  It was further alleged as to count 1 Gonzalez personally used a firearm (§ 12022.53, subd. (b); § 12022.5, subd. (a)), as to count 2 Gonzalez personally used a firearm (§ 12022.5, subd. (a)), and as to count 3 Gonzalez personally used and intentionally discharged a firearm (§ 12022.53, subds. (b) & (c); § 12022.5, subd. (a)).

Before the information was filed, on March 9, 2017, the court suspended criminal proceedings under section 1368 after defense counsel declared a doubt as to Gonzalez's competency.  Dr. Michael Musacco, a clinical psychologist, was appointed to evaluate Gonzalez.  Dr. Musacco diagnosed Gonzalez with "unspecified schizophrenia spectrum and other psychotic disorder" but found him competent to stand trial.  Criminal proceedings were reinstated on April 6, 2017.

---

[1] Undesignated statutory references are to the Penal Code.

On June 19, 2017, counsel again moved to suspend criminal proceedings under section 1368. On June 21, 2017, the court granted counsel's motion to determine Gonzalez's competency to stand trial and suspended proceedings. The court appointed a different clinical psychologist, Thomas Middleton, to evaluate Gonzalez, who diagnosed Gonzalez with "schizophrenia and other (unknown) substance use disorder." He noted Gonzalez "presents as quite delusional" and, in his opinion, not competent to stand trial. On July 12, 2017, the court determined Gonzalez was not competent to stand trial and referred him to Kern Behavioral Health and Recovery Services for examination. The professional team there recommended that Gonzalez be committed to Atascadero State Hospital for mental health treatment and competency restoration services and that he be treated with involuntary psychotropic medication.

On August 16, 2017, the court ordered Gonzalez committed to the Department of State Hospitals until his competency was restored. Gonzalez was admitted to Metropolitan State Hospital on November 20, 2017, and remained there until April 2018. The court ultimately found Gonzalez competent to stand trial and reinstated criminal proceedings on April 17, 2018.[2]

On April 24, 2019, the jury trial began. On May 2, 2019, the jury convicted on all counts and found all the enhancement allegations true.

On June 14, 2019, the court sentenced Gonzalez to an aggregate term of 23 years, eight months. On count 3, the court imposed the lower term of two years plus 20 years for discharging a firearm. (§ 12022.53, subd. (c)).

---

[2] The probation report notes Gonzalez's only other adult criminal conviction was on August 18, 2008, when he was convicted of driving under the influence of alcohol (Veh. Code, § 23152, subd. (a)) and of driving with an open container of alcohol (Veh. Code, § 23222, subd. (a)). In that case, criminal proceedings were suspended for six months in 2007 under section 1368.

On count 1, the court imposed a term of one year, eight months (one-third the middle term) to run consecutive to the term imposed on count 3. The court struck the firearm enhancements connected to count 1 for sentencing purposes.

On count 2, the court imposed the upper term of three years plus 10 years for the section 12022.5, subdivision (a), enhancement, stayed pursuant to section 654.

On count 4, the court imposed a concurrent term of 364 days in the county jail.

## STATEMENT OF FACTS

### I.     Prosecution's case

Late at night on February 22, 2017, N.N, a taxi driver, received a telephone call from Gonzalez requesting a ride from Bakersfield to Simi Valley. They agreed on a fare of $200.

N.N. arrived at the home address Gonzalez gave him and called Gonzalez to let him know he was there. Gonzalez said he was coming outside. Gonzalez approached the car on the driver's side. N.N. opened the driver's side window to get Gonzalez's bank card for payment. Gonzalez "showed" N.N. a "big gun" and threatened to shoot N.N. if he did not get out and give him the car. N.N., afraid for his life, got out of the car and ran away as the man sped off in N.N.'s gold Toyota Camry. N.N. called 911 and reported the incident; the call was played for the jury.

Gonzalez then drove N.N.'s Camry to a Bakersfield fast food restaurant drive-thru. He placed an order for fajitas and pulled up to the drive-thru window at about 1:05 a.m. Defendant pointed a "rifle gun" at the female employee's face and demanded money. When the employee asked if he was joking, Gonzalez fired a round from the shotgun into the stucco ceiling above the drive-thru window. The employee gave Gonzalez approximately $150 and Gonzalez drove off.

Officers responded to the fast food employee's 911 call, which was played for the jury. Officers arrived at the restaurant and soon noticed a car at a nearby gas station matching the description of the suspect's vehicle. The officers got back into their car to

4.

pursue the Camry, which Gonzalez was driving, as it was leaving the gas station. The officers activated their lights and siren to try to pull Gonzalez over, but Gonzalez continued driving.

Gonzalez got onto State Route 99 and led Bakersfield Police Department officers and California Highway Patrol officers on a high-speed chase on State Route 99 and Interstate 5, ultimately ending near the Santa Monica pier in a gas station parking lot. The speed of the pursuit ranged from 95 to 120 miles per hour. Officers found seven unfired Remington .12-gauge shotgun rounds in the Camry, a Winchester .12-gauge slug, and one expended Remington .12-gauge shotgun round. Officers also found a Daisy Steel Airgun in the car and $95.84 on Gonzalez's person.

Gonzalez called 911 during the chase at 1:57 a.m. The call was played for the jury. He told the dispatcher that he is being followed by CHP and that he will not resist arrest if the dispatcher tells the officers not to hurt him. He told the dispatcher he is a good man and people were trying to kill him in Bakersfield so he "had to take a car by force to get away." He said people and police officers had sabotaged him in Bakersfield. He further stated he wanted to be given a fair trial and did not want to get shot by police. He stated he was "trying to meet up with a girl and party with a girl right now." He lamented about not understanding why America is so racist, particularly why White people are so racist against Hispanics like himself. He said that "a bunch of white people" and "skin heads" falsely accused him of stealing money and drugs from them, and that he was going to leave Bakersfield to escape getting killed. After the first call ended, a CHP operator called Gonzalez at 2:15 a.m. This call was also played for the jury. Gonzalez told the operator about racist white people who were against him. He said he "got [the] car" he was driving because he wanted to save his life.

Between 7 and 8 a.m. on February 23, 2017, CHP officers recovered a Benelli .12-gauge shotgun from "the center median of the southbound [State Route 99] freeway." The shotgun was swabbed for DNA. Gonzalez's DNA was consistent with one of the

5.

two DNA profiles found on the gun.  Markings on shells test fired from the Benelli shotgun matched the markings on the expended shotgun shell found in the Camry.

## II. Defense's case

The defense's theory was that Gonzalez was not guilty of the charged offenses because he did not commit the unlawful acts with the requisite unlawful intent, as he was experiencing a psychotic episode because of his mental illness that prevented him from forming that intent.  Two mental health professionals, Dr. Cecilia Shia, a psychiatrist, and Dr. Michael Musacco, a clinical psychologist, testified for the defense.  Gonzalez also testified in his own defense.

### A. Dr. Cecilia Shia

Dr. Shia, a staff psychiatrist at Metropolitan State Hospital, treated Gonzalez for about five months, from November 2017 to April 2018.[3]  Dr. Shia performed an initial assessment of Gonzalez on November 22, 2017, and diagnosed him with "unspecified schizophrenia spectrum and other psychotic disorder."  Dr. Shia described Gonzalez as having paranoid ideation and delusional thoughts.  She stated Gonzalez was not malingering.  She prescribed him anti-psychotic medication, and after about five months of his medication regimen he no longer experienced paranoid ideation or delusional thoughts.

---

[3] As we have stated, Gonzalez was sent to Metropolitan State Hospital to have his competency restored after the trial court found him not competent to stand trial under section 1368.  During direct examination, Dr. Shia explained that Gonzalez was discharged from the hospital and sent back to the trial court after hospital staff determined his competency had been restored.  During cross-examination, the court ruled outside the presence of the jury that there were to be no questions of any witness about why Gonzalez was committed to the state hospital.  At most, the parties could elicit the simple fact that Gonzalez was involuntarily committed.  This ruling seems to have been belated since Dr. Shia had already testified how the state hospital staff determined Gonzalez could be returned to the court because his competency had been restored, which necessarily implies Gonzalez was involuntarily committed because he was found incompetent to stand trial.  Neither party has mentioned it.

## B.    Dr. Michael Musacco

Dr. Musacco evaluated Gonzalez twice.  He first evaluated Gonzalez in March 2017 under court appointment to assess Gonzalez's competency under section 1368.  He evaluated Gonzalez again in March 2019 after being retained by the defense.  On both occasions, Dr. Musacco determined Gonzalez suffered from "unspecified schizophrenia spectrum disorder."[4]  He also diagnosed Gonzalez in 2019 with "unspecified substance use disorder."  Dr. Musacco testified that, to his knowledge, his diagnosis was consistent with the diagnoses of all the other mental health professionals who had evaluated Gonzalez since his arrest.

Dr. Musacco testified that, in 2019, he read the transcripts of the two 911 calls between Gonzalez and dispatch during the high-speed chase, and he stated these transcripts bolstered his diagnoses.  He thought it was "unusual" that Gonzalez called 911 as he was leading police on a chase down the freeway.  He also thought Gonzalez's repeated comments about others thinking he was Jesus Christ were "odd."

Dr. Musacco testified that in 2019 Gonzalez was much more clear, his thoughts were more organized, and he was "much less mentally ill" than he was in 2017, though he still had delusional beliefs.  Gonzalez still believed people were plotting against him and that people had been poisoning him.  He also expressed concern that he may be Jesus Christ.  But overall, Gonzalez was much more able to have a back-and-forth, rational conversation with Dr. Musacco, whereas Gonzalez "wasn't able to do that so well" in 2017.  Dr. Musacco did not believe Gonzalez was malingering.

## C.    Gonzalez Trial Testimony

Gonzalez testified he was committed involuntarily to Metropolitan State Hospital. He woke up on February 22, 2017, the day he committed the offenses, around 3 p.m.  At

---

**4** As previously noted, in March 2017, Dr. Musacco found Gonzalez was competent to stand trial despite his diagnosis.

that time, he had been sleeping in his parents' backyard with his dog. He stated he was homeless because his mother told him he could not go inside of the house anymore. He went to a restaurant near his parents' house to get something to eat and "hung out" in the area the rest of the day until nighttime.

He testified people had been sending him death threats in the time leading up to February 22, 2017. He would call a chat line and people he spoke to would threaten his life. He also went onto an online dating website where people would send him death threats. He said these people said they were going to kill him because they thought he was Jesus Christ and an undercover cop. He stated these people were going to kill him and crucify him.

Gonzalez's counsel asked him if all the threats he had received really happened, and Gonzalez said yes.[5] Gonzalez further described how he would walk at night and gang members in cars would see him, hit the brakes, and pull over right next to him on the sidewalk. Gonzalez would take off running because he was afraid they would shoot or stab him.

On February 22, 2017, around 4:30 or 5 p.m., some "guys" he knew asked if he wanted to use methamphetamine. He was feeling very fatigued that day, so he said yes because methamphetamine energized him. The guys passed him a pipe with methamphetamine in it and he took "a couple of hits." He testified the methamphetamine produced a different high than what it usually does for him. This time it gave him a headache and made him feel weak and dizzy. After smoking he "hung out" in the area by himself until he came across other people he knew and smoked marijuana with them. He then went to a fast food restaurant nearby and went home and went to sleep around 10 p.m. He stated he could not "really remember anything after" going home. He remembered feeling disoriented before he went home. He stated he went into his parents'

---

[5] Gonzalez testified on April 29, 2019, more than two years after the offenses.

backyard and lied down and played with his dog. He thinks he blacked out after arriving home.

He remembers driving right before he was arrested somewhere in the Los Angeles area. However, he has no recollection of anything before that. He did not remember talking with a taxi driver, showing the driver a shotgun, threatening the driver, being at the fast food restaurant drive-thru, or throwing the shotgun onto the freeway. He made clear that he remembers being in his backyard and then blacking out, and the next thing he remembers is pulling into the gas station in the Los Angeles area.

## DISCUSSION

### I. Mental health diversion

Gonzalez claims his counsel was ineffective in failing to seek pretrial mental health diversion under section 1001.36, and contends he is entitled to a remand for the trial court to consider his suitability for such diversion. We conclude as a threshold matter that the issue was forfeited for failure to raise it below, and we reject Gonzalez's ineffective assistance of counsel argument because the record fails to demonstrate that counsel provided ineffective assistance.

Effective June 27, 2018, "the Legislature enacted sections 1001.35 and 1001.36 as part of Assembly Bill No. 1810 (2017—2018 Reg. Sess.) .... [Citation.] Section 1001.36 gives trial courts the discretion to grant pretrial diversion for individuals suffering from certain mental health disorders. (§ 1001.36, subd. (a).)" (*People v. Frahs* (2020) 9 Cal.5th 618, 626.) "The stated purpose of the diversion statute 'is to promote all of the following: [¶] (a) Increased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety. [¶] (b) Allowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings. [¶] (c) Providing diversion that meets the unique mental

9.

health treatment and support needs of individuals with mental disorders.' (§ 1001.35, subds. (a)—(c).)" (*Ibid.*)

Section 1001.36 defines "pretrial diversion" as "the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment …." (§ 1001.36, subd. (c).) If a defendant is charged with a qualifying offense, a trial court may grant pretrial diversion if it finds all of the following: (a) the defendant suffers from a qualifying mental disorder;[6] (b) the mental disorder was a significant factor in the commission of the charged offense; (c) in the opinion of a qualified mental health expert, the defendant's symptoms will respond to mental health treatment; (d) the defendant consents to diversion and waives his or her right to a speedy trial; (e) the defendant agrees to comply with treatment as a condition of diversion; and (f) the defendant will not pose an unreasonable risk of danger to public safety if treated in the community. (§ 1001.36, subd. (b)(1)(A)—(F).)

If the six criteria in section 1001.36, subdivision (b)(1), are met, and if the trial court "is satisfied that the recommended inpatient or outpatient program of mental health treatment will meet the specialized mental health treatment needs of the defendant" (§ 1001.36, subd. (c)(1)(A)), the court may order diversion into an approved mental health treatment program for up to two years (§ 1001.36, subd. (c)(1) & (3)). If the defendant commits an additional offense or otherwise performs unsatisfactorily in the diversion program, the court may reinstate the criminal proceedings. (§ 1001.36, subd. (d).) "If the defendant has performed satisfactorily in diversion, at the end of the

---

[6] Section 1001.36, subdivision (b)(1)(A), requires the court be "satisfied that the defendant suffers from a mental disorder as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders, including, but not limited to, bipolar disorder, schizophrenia, schizoaffective disorder, or post-traumatic stress disorder, but excluding antisocial personality disorder, borderline personality disorder, and pedophilia."

period of diversion, the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion," and "the arrest upon which the diversion was based shall be deemed never to have occurred …." (§ 1001.36, subd. (e).)

A defendant bears the burden of making a prima facie showing that he meets the minimum requirements of eligibility for diversion. (§ 1001.36, subd. (b)(3).) Even if a defendant otherwise satisfies the six eligibility requirements, the court must nonetheless be satisfied that the recommended mental health treatment program "will meet the specialized mental health treatment needs of the defendant." (§ 1001.36, subd. (c)(1)(A).) "Before approving a proposed treatment program, the court shall consider the request of the defense, the request of the prosecution, the needs of the defendant, and the interests of the community." (§ 1001.36, subd. (c)(1)(B).)

To establish ineffective assistance, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687—692 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216—218 (*Ledesma*).)

In measuring counsel's performance, judicial review is highly deferential. (*Ledesma, supra,* 43 Cal.3d at p. 216; *In re Andrews* (2002) 28 Cal.4th 1234, 1253 (*Andrews*).) "When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).) When the strategic reasons for challenged decisions are not apparent from the record, we will not find ineffective assistance of counsel unless there could have been " ' "no conceivable tactical purpose" ' " for counsel's acts or omissions. (*People v. Earp*

11.

(1999) 20 Cal.4th 826, 896 (*Earp*); see *People v. Arce* (2014) 226 Cal.App.4th 924, 930—931 (*Arce*).)

The record does not demonstrate whether defense counsel was aware of section 1001.36, and we cannot presume for purposes of our analysis that counsel was unaware of the statute. Gonzalez contends that, in any event, there is no satisfactory explanation for why counsel would fail to move for mental health diversion. We disagree.

We first observe that "unspecified schizophrenia and other psychotic disorder" is a qualifying mental health condition under section 1001.36, subd. (b)(1)(A), and the People do not dispute that. Additionally, Gonzalez's mental health issues certainly were well known to defense counsel, as counsel more than once declared a doubt as to Gonzalez's competency under section 1368. Nevertheless, defense counsel could have chosen not to request diversion for a variety of reasons. Specifically, counsel could have discussed the matter with Gonzalez, and he may have refused to consent to diversion or Gonzalez could have refused to comply with mental health treatment. (§ 1001.36, subd. (b)(1)(D) & (E).) Counsel may also have determined that there was insufficient evidence to support one or more of the requirements for mental health diversion. There also could be other reasons that reasonably led defense counsel to conclude that the trial court would have ruled that defendant was ineligible for mental health diversion. "Under those circumstances, a reviewing court has no basis on which to determine whether counsel had a legitimate reason for making a particular decision, or whether counsel's actions or failure to take certain actions were objectively unreasonable." (*People v. Mickel* (2016) 2 Cal.5th 181, 198.) Nor has Gonzalez shown "affirmative evidence that counsel could have had 'no rational tactical purpose' for these decisions." (*Id.* at p. 200.)

Because there are legitimate reasons why defense counsel may have chosen not to pursue a mental health diversion eligibility hearing on defendant's behalf, we cannot conclude defense counsel's performance was objectively unreasonable. Under these

12.

circumstances, an ineffective assistance claim is more appropriately decided in a habeas corpus proceeding. (*People v. Gray* (2005) 37 Cal.4th 168, 211 (*Gray*) [rejecting claim of ineffective assistance of counsel because it "is more appropriately raised in a petition for a writ of habeas corpus"]; *People v. Jones* (2003) 29 Cal.4th 1229, 1263, habeas granted in *Jones v. Chappell* (C.D. Cal. 2014) 31 F.Supp.3d 1050 [issues requiring review of matters outside the record are better raised on habeas corpus rather than on direct appeal]; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266—267 [a claim of ineffective assistance of counsel relating to " ' "why counsel acted or failed to act in the manner challenged" ' " is more appropriately decided in a habeas corpus proceeding].)

## II.    Cruel and unusual punishment

Gonzalez contends that the sentence of 23 years, eight months constitutes cruel and unusual punishment as applied to him. Specifically, he argues it is cruel and unusual under the circumstances of this case, especially because he has a schizophrenia spectrum disorder.

### A.    Forfeiture

Preliminarily, the People argue Gonzalez forfeited this contention by failing to raise it below. We agree. (*People v. Kelley* (1997) 52 Cal.App.4th 568, 583; *People v. DeJesus* (1995) 38 Cal.App.4th 1, 27 (*DeJesus*).) We also note something very significant that neither party on appeal appears to have noticed. Gonzalez's counsel, in the defense's sentencing brief, *requested* the sentence of 23 years, eight months, which was less than the 30-year maximum possible sentence. Thus, the trial court gave the defense exactly what it asked for. Accordingly, it would be more accurate to say that this contention was forfeited not because the defense failed to raise it, but rather because the defense invited the error. " 'Under the doctrine of invited error, when a party by its own conduct induces the commission of error, it may not claim on appeal that the judgment should be reversed because of that error.' " (*Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1000.) However, "[a]s in any other situation, [Gonzalez] can

always claim he received ineffective assistance of counsel." (*People v. Cooper* (1991) 53 Cal.3d 771, 831.)

While Gonzalez claims his trial counsel was ineffective for failing to raise a cruel and unusual punishment claim, we think the more accurate framing would be that counsel was ineffective for requesting the 23 years, eight months sentence and not a lesser sentence. The People argue Gonzalez's ineffective assistance claim should be rejected because the sentence imposed was not cruel and unusual and, even had counsel objected, it is not reasonably probable defendant would have received a different sentence.

Under these circumstances, the ineffective assistance of counsel argument requires little additional discussion. If the sentence did constitute a cruel and unusual punishment, there could be no rational tactical purpose for failing to raise the issue; moreover, the failure to raise it would necessarily be prejudicial. We conclude that we should reach the underlying cruel and unusual punishment issue, even if only to evaluate Gonzalez's ineffective assistance of counsel claim. (*People v. Norman* (2003) 109 Cal.App.4th 221, 229—230; *DeJesus, supra,* 38 Cal.App.4th at p. 27.)

## B. Cruel and unusual punishment framework

"[I]t is ... firmly established that '[t]he concept of proportionality is central to the Eighth Amendment,' and that '[e]mbodied in the Constitution's ban on cruel and unusual punishments is the "precept of justice that punishment for crime should be graduated and proportioned to [the] offense." ' " (*In re Coley* (2012) 55 Cal.4th 524, 538, quoting *Graham v. Florida* (2010) 560 U.S. 48, 59; accord, *People v. Contreras* (2018) 4 Cal.5th 349, 359.)

In assessing a claim of cruel and unusual punishment, the court must "decide whether the penalty given 'is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity,' thereby violating the prohibition against cruel and unusual punishment of the Eighth Amendment of the federal Constitution or against cruel or unusual punishment of article I, section 17

14.

of the California Constitution." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1042.) "Although articulated slightly differently, both standards prohibit punishment that is 'grossly disproportionate' to the crime or the individual culpability of the defendant. [Citations.] Under both standards, the court examines the nature of the offense and the defendant, the punishment for more serious offenses within the jurisdiction, and the punishment for similar offenses in other jurisdictions." (*People v. Mendez* (2010) 188 Cal.App.4th 47, 64 (*Mendez*).)

Whether a sentence is cruel or unusual is a question of law reviewed de novo. (*People v. Baker* (2018) 20 Cal.App.5th 711, 722.)

### C.     Ineffective assistance of counsel analysis

We reproduce the standard for ineffective assistance of counsel analysis. To establish ineffective assistance, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced the defendant. (*Strickland, supra,* 466 U.S. at pp. 687—692; *Ledesma, supra,* 43 Cal.3d at pp. 216—218.)

In measuring counsel's performance, judicial review is highly deferential. (*Ledesma, supra,* 43 Cal.3d at p. 216; *Andrews, supra,* 28 Cal.4th at p. 1253.) "When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance." (*Mai, supra,* 57 Cal.4th at p. 1009.) When the strategic reasons for challenged decisions are not apparent from the record, we will not find ineffective assistance of counsel unless there could have been " ' "no conceivable tactical purpose" ' " for counsel's acts or omissions. (*Earp, supra,* 20 Cal.4th at p. 896; see *Arce, supra,* 226 Cal.App.4th at pp. 930—931.)

Gonzalez offers a perfunctory and conclusory argument regarding the alleged disproportionality of his sentence that does not demonstrate how his sentence violates

15.

either the federal or state constitution. Thus, he necessarily has not shown prejudice by his counsel's failure to argue for a lesser sentence than 23 years, eight months.

Gonzalez states: "Proportionality is still the constitutional measuring rod for excessive sentencing and appellant's punishment does not fit his current crimes, his person, or his record. Appellant's schizophrenia and drug use are mentally illnesses [*sic*], not crimes." He also says that "[b]oth the state and federal constitutions provide that a punishment is unconstitutional where it is grossly out of proportion to the severity of the crimes." His failure to support these conclusory assertions with legal analysis is fatal to his argument. "We are not obligated to make arguments for defendants and may and do disregard conclusory arguments failing to disclose the reasoning by which defendants reached the conclusions they ask us to adopt." (*KCSFV I, LLC v. Florin County Water Dist.* (2021) 64 Cal.App.5th 1015, 1031.) " 'It is the responsibility of the appellant ... to support claims of error with meaningful argument and citation to authority. [Citations.] When[, as here, meaningful] legal argument with citation to authority is not furnished on a particular point, we may treat the point as forfeited ....' " (*Blizzard Energy, Inc. v. Schaefers* (2021) 71 Cal.App.5th 832, __, 2021 WL 5366815 at p. 12.)

Gonzalez's failure to offer any analysis on the alleged disproportionality of his sentence under either the federal or state constitution has forfeited his argument. Instead of focusing on the concept of disproportionality, he asserts that he and society would both be "best served" if he received mental health treatment. He posits, without citing to any authority, that "an extended residential treatment program[]" under section 1001.36 would be a "more effective and less expensive" way to protect the public "from people … like appellant who commit dangerous crimes because they are mentally ill[.]" Not only are his assertions regarding alternative sentences not supported by any cogent analysis and hence forfeited, they are irrelevant because the availability of other sentencing choices says nothing about the proportionality of the sentence that was imposed.

Setting aside for a moment that Gonzalez's argument on the merits has been forfeited, we do not believe the record demonstrates that the 23-year, eight-month sentence was disproportionate in any respect. This case involved a dangerous crime spree. Gonzalez carjacked someone at gun point, robbed a restaurant at gunpoint and fired a round in the employee's presence, and then led officers on a lengthy high-speed chase. This was outrageous conduct, despite the fact that fortunately no one was hurt. While the firearm usage in the carjacking and robbery both elevated the seriousness of the crime, the firearm discharge at the restaurant was particularly menacing. We cannot conclude Gonzalez's sentence is disproportionate when considering the nature of the offenses. (*Mendez, supra,* 188 Cal.App.4th at p. 64.)

In sum, by not supporting his argument with cogent analysis, Gonzalez has forfeited his argument on the merits of his cruel and unusual punishment claim. We have no basis for concluding his sentence was unconstitutional under either the federal or state constitution. We affirm the sentence.

## III. Ability to pay fines, fees, and assessments

At sentencing, Gonzalez was ordered to pay a court facilities assessment of $30 per count for a total of $120 (Gov. Code, § 70373), a court operations assessment of $40 per count for a total of $160 (§ 1465.8), and a minimum $300 restitution fine (§ 1202.4, subd. (b)).[7] Although he did not object below, Gonzalez contends the restitution fine, fees, and assessments imposed by the trial court violate his "state and federal due process guarantees because it simply punished [him] for being poor." He requests a remand for the trial court to ascertain his ability to pay the fines, fees, and assessments. He relies on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) in support, which was decided

---

[7] The court here also imposed and stayed a matching $300 parole revocation restitution fine (§ 1202.45, subd. (a)). However, because this fine is essentially a corollary of the restitution fine imposed under section 1202.4, subdivision (b), we will not separately address it. (See § 1202.45, subd. (a).)

on January 8, 2019, over five months before he was sentenced on June 14, 2019.  To the extent his argument is forfeited, he alleges ineffective assistance of counsel.

*Dueñas* held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay" before it imposes any fines or fees.  (*Dueñas, supra,* 30 Cal.App.5th at pp. 1164, 1167.)  This court has previously rejected that contention.  (*People v. Aviles* (2019) 39 Cal.App.5th 1055, 1069 (*Aviles*) [*Dueñas* "incorrectly relied upon a due process analysis to examine ... constitutional objections to the [trial] court's imposition of ... fines, fees, and assessments ...."]; accord, *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1056—1057 [due process not violated when defendants are not denied access to the courts, are not prohibited from presenting a defense, are not incarcerated due to an inability to pay prior fees, fines or assessments, do not face ongoing unintended punitive consequences, and do not suffer a violation of a fundamental liberty interest].)

Other courts have declined to extend the holding of *Dueñas* beyond the unique facts of that case, which involved an indigent, homeless, mother of two who subsisted on public aid while suffering from cerebral palsy (*Dueñas, supra,* 30 Cal.App.5th at pp. 1160—1161), and who accumulated repeated criminal conviction assessments and fines in a series of "cascading consequences" stemming from "criminal proceedings driven by, and contributing to, [the defendant's] poverty" (*id.* at pp. 1163-1164).  (See *People v. Caceres* (2019) 39 Cal.App.5th 917, 928—929 [declining to apply *Dueñas's* "broad holding" beyond its unique facts]; *People v. Johnson* (2019) 35 Cal.App.5th 134, 138 [distinguishing *Dueñas* on its facts].)

Even were *Dueñas* correctly decided, we need not consider Gonzalez's *Dueñas*-based challenge because he has forfeited the issue.  His failure to raise *Dueñas* at sentencing forfeited his arguments by operation of normal rules of appellate review.  (*People v. Scott* (1994) 9 Cal.4th 331, 351—354 [to preserve a sentencing issue for appellate review, the defendant must raise it in the trial court].)

18.

Anticipating forfeiture, Gonzalez claims his counsel was ineffective for failing to raise the issue of his inability to pay. However, the record does not establish his counsel was ineffective for failing to object. To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland, supra,* 466 U.S. at pp. 687—688, 693—694; *Ledesma, supra,* 43 Cal.3d at pp. 216—218.) To show prejudice, the defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland,* at pp. 693—694; *Ledesma, supra,* at pp. 217—218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland,* at p. 694; accord, *Ledesma,* at p. 218.)

Our Supreme Court has explained that "[i]t is ... particularly difficult to establish ineffective assistance of counsel on direct appeal, where we are limited to evaluating the appellate record. If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.) The Court has also stated that an appellate court will "reverse on the ground of inadequate assistance on appeal only if the record affirmatively discloses no rational tactical purpose for counsel's act or omission." (*People v. Montoya* (2007) 149 Cal.App.4th 1139, 1148.)

We reject Gonzalez's ineffective assistance of counsel claim because the record does not affirmatively demonstrate counsel had no rational purpose for failing to raise *Dueñas* at the sentencing hearing. Although the probation report contained information suggesting Gonzalez may be unable to pay the fines, fees, and assessment, the record does not affirmatively establish his inability to pay. The record is not fully developed regarding Gonzalez's assets and sources of income, and it is therefore possible that

19.

counsel had reason to believe that Gonzalez was able to pay the fines, fees, and assessments.

According to the probation report, Gonzalez reportedly had no assets or debts, last worked a job in 2001 for minimum wage, and had been receiving $889 per month in Supplemental Security Income for an unspecified length of time. His address was listed as "homeless." He testified at trial he slept in the backyard of his parents' house with his dog, and stated he lived outside because his parents told him he could not be inside the house anymore. The record does not state how much money Gonzalez spends per month. While this information indicates that Gonzalez is a person of very little means, his inability to pay the several hundred dollars of fines, fees, and assessments was not affirmatively established by the record; the undeveloped record leaves open the possibility that counsel had legitimate reasons for not raising *Dueñas*. We therefore reject his ineffective assistance of counsel claim. Under these circumstances, an ineffective assistance claim is more appropriately decided in a habeas corpus proceeding. (*Gray, supra,* 37 Cal.4th at p. 211.)

## DISPOSITION

The judgment is affirmed.


SNAUFFER, J.

WE CONCUR:


DETJEN, ACTING P. J.


DE SANTOS, J.

20.